COMTEL CORPORATION et al.,
Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 215, Docket 30791.

United States Court of Appeals
Second Circuit.

Argued Feb. 21, 1967.

Decided May 4, 1967.

George G. Tyler, New York City
(Cravath, Swaine & Moore, David G.
Ormsby, New York City, on the brief),
for petitioners.

Crombie J. D. Garrett, Washington, D.
C. (Mitchell Rogovin, Asst. Atty. Gen.,
Lee A. Jackson, Harold C. Wilkenfeld,
Washington, D. C., on the brief), for re-
spondent.

Before FRIENDLY, ANDERSON and
FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge.

This is an appeal from a decision of
the Tax Court, 45 T.C. 294 (1965), hold-

ing Comtel Corporation and various transferees of its assets in liquidation liable for an income tax deficiency of $215,621.33.[1] The Tax Court held that the substance of the sole transaction Comtel engaged in during its corporate life was a loan, although the form was a stock purchase and resale, and that the substance controls. The effect of the decision was to deem Comtel the recipient of interest income taxable at the ordinary corporate income rate, rather than the beneficiary of nonrecognition treatment under section 337 of the Internal Revenue Code of 1954.[2] We affirm the Tax Court.

Most of the underlying facts—although not the significant one of intent—are stipulated and extensively set forth in the Tax Court's opinion. More briefly, they are as follows: In 1957, Zeckendorf Hotels Corporation ("Zeckendorf")[3] wanted to acquire the Hotel Commodore, then operated under a ground lease by Commodore Hotel, Inc., a publicly held corporation. Zeckendorf was unable to convince that corporation to part with its hotel; accordingly, in October of that year, Zeckendorf made a public tender offer, hoping to attract sufficient shares to merge Commodore Hotel, Inc. into Zeckendorf. By February 6, 1958, Zeckendorf had been tendered over ninety-one per cent of the Commodore stock, and by the terms of its offer, was bound to purchase it, an obligation guaranteed by Zeckendorf's parent Webb & Knapp, Inc. as well. However, Zeckendorf had been unable, despite its attempts in late 1957 and early 1958, to borrow enough cash to honor the tenders, even with Webb & Knapp's guarantee. While shopping for a loan,

Zeckendorf approached the principals of what became Comtel Corporation. But they too refused to loan Zeckendorf the money necessary to acquire the Commodore stock. However, they did come to a formally different understanding, memorialized in various interrelated documents executed on February 10 and 11, 1958. What transpired pursuant to this agreement—much simplified and in respondent's formal terms—follows: Comtel Corporation was formed with $1,900,000 capital paid in equally in cash by its three equal stockholders—Tri-Continental Financial Corporation ("Tri-Fi"), Eastman Dillon, Union Securities & Co., and a Zeckendorf nominee. Comtel, in turn, secured a loan of $6,763,855 from the Irving Trust Company, at six per cent per annum, on the strength of a guarantee by a realty corporation controlled by Roger L. Stevens, the fourth principal in this transaction, and the only one not a stockholder in Comtel.[4]

Next, with Comtel's cash, Zeckendorf simultaneously acquired the Commodore stock and "sold" it to Comtel for exactly its purchase cost. At the same time, Comtel gave back to Zeckendorf an exclusive "option" to repurchase the Commodore stock during the period August 15–September 2, 1958, slightly more than six months from the date of the agreement. The terms of Zeckendorf's repurchase option price were fixed as the total of: (a) the price Comtel paid Zeckendorf for the shares; (b) the interest cost of the Irving Trust loan; (c) a six per cent per annum return on the capital investment of the shareholders in Comtel; (d) all of Comtel's expenses connected with its organization and dissolu-

1. The transferee petitioners are 2 of Comtel's corporate former stockholders; 28 partners of Comtel's third former stockholder, Eastman Dillon, Union Securities & Co.; and the estate of such a deceased partner.

2. Hereinafter cited by section only.

3. Then 9113 Corporation, and a wholly-owned subsidiary of Webb & Knapp, Inc.,

whose moving force was William Zeckendorf.

4. Stevens received $50,000 for arranging the loan, and one of his corporations earned $120,000 upon consummation of the rest of the transaction, all ultimately paid by Zeckendorf.

tion and incurred in purchasing and reselling the Commodore stock;[5] and finally, (e) the lump sum of $600,000. (Zeckendorf, of course, would get back the third of Comtel's net profit on the sale allocable to the shares held by its nominee.) In essence, if the option were exercised, the two shareholders in Comtel other than Zeckendorf in the space of six or seven months would get back their $1,266,667 capital with a net pretax return of six per cent per annum thereon plus $400,000 (two-thirds of $600,000).[6]

Under the terms of the agreement, Eastman Dillon's and Tri-Fi's risk of loss was practically eliminated. These security arrangements were included in the arrangement: Zeckendorf's Comtel stock was subordinated to the prior right of payment of the other shareholders' stock, and Zeckendorf and Webb & Knapp guaranteed directly to these shareholders the same full payment of their investment contained in the stock subordination provisions. Full payment of the investment of the other two shareholders was defined as: (a) all capital they invested in Comtel; (b) a return of six per cent per annum on that capital; (c) all expenses incurred by these stockholders in connection with their investment. In other words, whether or not Zeckendorf exercised its option, the subordination agreement and the indemnity agreement assured Eastman Dillon and Tri-Fi the return of their capital plus a net pre-tax return thereon of six per cent per annum.

During the period before its option matured, Zeckendorf was at last able to obtain a long term loan—from Evelyn J. Lubin, wife of a New York realtor. It then notified Comtel of its intention to exercise its rights. However, it was sub-

sequently discovered that since some of the Commodore stock had been acquired within six months of the agreed exercise period, purchase then might bring into play section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), depriving Comtel of its profit.[7] Therefore, the Comtel-Zeckendorf agreement was renegotiated. In substance, only three changes were made. The Irving Trust loan was prepaid and replaced by a loan to Comtel by Mrs. Lubin—at the increased rate of thirteen per cent per annum, also to be paid by Zeckendorf as part of the option price. The lump sum element of the option price was reduced from $600,000 to $480,000. And finally, the exercise period of the option was postponed to a time safely beyond the critical six month period.

The new initial exercise date was September 5, 1958; on that day and the day before, the remaining relevant events occurred. Upon Zeckendorf's notification on September 4 that it would purchase, Comtel adopted a plan of complete liquidation authorizing dissolution and distribution of all corporate assets, and Comtel's shareholders approved it. On September 5, Zeckendorf acquired the Commodore shares, tendering full payment, and immediately effected a statutory merger of Commodore into Zeckendorf; Comtel paid its remaining liabilities, and, finally, by the end of the day, Comtel had completely liquidated and made a final liquidation distribution to its stockholders, entirely in cash. It is that liquidation which is the basis of transferee liability here.

Comtel Corporation treated its gain of $872,028.79 as not requiring recognition under section 337, and its transferee stockholders all reported a capital gain upon Comtel's liquidation. It is the Commissioner's contention that this

---

5. Including $120,000 to Stevens's corporation.

6. Later reduced to $320,000, 2/3 of $480,-000; see infra.

7. Section 16(b) provides in essence that if any officer, director or beneficial owner of more than 10% of a corporation's stock purchases and sells any such stock within a 6 month period, any profit automatically inures to the corporation.

transaction, although in the form of a purchase and resale, was in substance a loan from Comtel to Zeckendorf and that, therefore, the nonrecognition provisions do not apply, and the gain must be treated as interest income and taxed at ordinary rates to Comtel.

The Tax Court stated the issue[8] before it in these terms (45 T.C. at 304):

What was the true legal nature of the transactions between Comtel Corp. and Zeckendorf Hotels Corp., that resulted in Comtel's realization of undisputed gain or profit of $872,028.79—which Comtel now contends is not recognizable for income tax purposes? Did these transactions actually represent a *purchase* by Comtel from Zeckendorf of the complete beneficial and legal ownership of nearly all the outstanding shares of Commodore Hotel, Inc. —followed a few months later by a *sale back to Zeckendorf* of the same interest in these identical shares at a greatly increased price? Or on the other hand, were these transactions, in substance and reality as distinguished from form, merely steps in a complex, prearranged financing plan: Under which Comtel temporarily supplied funds to Zeckendorf for meeting an existing obligation to buy said Commodore shares; under which Comtel held said shares as security for its loan; and under which Zeckendorf then repaid the loan in full, together with additional prearranged amounts which were in the nature of interest on money loaned and compensation for financial services rendered?

The Tax Court concluded that this entire transaction was in substance and reality a seven-month loan, in which Zeckendorf was loaned over $8,000,000 in cash and paid interest of over $872,-000.[9] It is conceded that all the documents involved and all the books of account of both Comtel and Zeckendorf treat the transaction as a purchase and resale by Comtel and that transfer taxes were paid on each phase of the transaction.[10] The Tax Court weighed these factors but found them wanting.

In overturning the consistent formal pattern of purchase and resale, the Tax Court relied on various circumstances: First, it found that Zeckendorf never wavered in its desire to acquire the Commodore stock and ultimately did achieve its objective, and never intended to and did not surrender complete ownership of the Commodore shares to Comtel. Second, Tri-Fi and Eastman Dillon were primarily interested in making a high yield, risk proof investment, not in embarking on hotel operation. Third, Comtel's rights in the Commodore stock during the period Zeckendorf's option was outstanding were similar to those of a mortgagee; e. g., Comtel was not permitted to sell or dispose of or pledge the shares (except to Irving Trust Company). Fourth, the profit from the option was not intended to result from appreciation in value of the Commodore shares or from operation of the hotel, but from the prearranged fixed option price. Fifth, the option was of short duration, and Zeckendorf could exercise it merely by paying a sum which looks just like interest and compensation for financing services on a purchase-money mortgage. Finally, though concededly there was no legal obligation binding Zeckendorf to exercise its option, the Tax Court found that realistically Zeckendorf was compelled to do so. Otherwise, through the

8. There was an alternative issue before the Tax Court, which it—as do we— found unnecessary to decide: Was Comtel a "collapsible corporation" under § 341(b), precluding it from nonrecognition under § 337?

9. However, under the various agreements a portion of this amount would eventually be returned to Zeckendorf in its capacity as stockholder of Comtel, thus apparently reducing the effective annual rate of interest to about 15%.

10. Apparently, this expense was borne by Zeckendorf both as seller and purchaser, since it was obligated to pay Comtel's expenses in acquiring and selling the stock.

subordination agreement, Zeckendorf might lose the $633,000 capital investment it made in Comtel, through the indemnity agreement Webb & Knapp might lose an even greater amount, and in addition Zeckendorf would lose the benefits of all its efforts and expenses in arranging the Commodore stock acquisition, negotiating the Comtel deal, and planning for the subsequent statutory merger of Commodore Hotel, Inc. into itself.

Petitioners take serious issue with each of the Tax Court's bases for ignoring the formal nature of the transaction. Thus, they claim that it is irrelevant whether Zeckendorf always hoped to acquire the Commodore stock; what counts is whether it was in a position to do so. In this respect, petitioners note that it was stipulated that Zeckendorf could not get a loan when this deal was arranged and was able to do so only months later. Similarly, they say that it is not significant that Eastman Dillon and Tri-Fi preferred to get a high yield on an investment rather than become hotel operators through Comtel, since their wish had no effect on whether Zeckendorf would exercise the option or not, nor did it change Comtel's rights in the Commodore stock nor did it create a debt owed by Zeckendorf to Comtel. Again, they point out that Comtel's agreement not to sell or encumber the Commodore stock is entirely consistent with an option agreement covering unique property; such an agreement is not like a mortgage because the vital element of a debt owing is absent. In addition, that the option duration was prearranged and short and the price fixed in advance are not controlling; almost all options fix the price in advance and run for a prearranged period, and many run for only just over six months. Finally, petitioners level their biggest attack on the Tax Court's finding that from a practical standpoint, if not legally, Zeckendorf was compelled to exercise its option rights. Thus, they present computations to show that unless there had been an appreciation in the value of the Commodore shares from their original cost to Zeckendorf through the tender it would have been bad business to exercise the option.

■ We are not called upon to consider individually each of these volleys back and forth or even to weigh the whole in the first instance; the Tax Court has already done the latter. Ordinarily, it is said, we pass upon decisions of the Tax Court under a "quite restricted" standard of review—at least as to determinations of fact—Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 290, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), and the observation of the Court there would seem pertinent (id. at 289, 80 S.Ct. at 1198):

> Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the main springs of human conduct to the totality of the facts of each case. The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact.

While Miller v. Commissioner of Internal Revenue, 327 F.2d 846 (2d Cir.), cert. denied, 379 U.S. 816, 85 S.Ct. 32, 13 L.Ed.2d 28 (1964) (dictum), indicated that less reliance may be placed on factual findings of the Tax Court when they do not resolve credibility of live witnesses, we do not read that case as suggesting that the Supreme Court's language quoted in text is irrelevant here. See Fanning v. Conley, 357 F.2d 37, 42 & n. 15 (2d Cir. 1966). However, petitioners urge that the issue before us is one of law only, so that we are not limited in our review. We do not propose to enter the debate of whether the Tax Court's conclusions were in part "factual inferences" from stipulated facts, see Weddle v. Commissioner of Internal Revenue,

325 F.2d 849, 851 (2d Cir. 1963)—as would appear to be the case—or purely conclusions of law. For we have carefully examined the record and the Tax Court's ultimate holding that the transaction here was essentially a loan rather than a sale and we see no adequate reason to disturb it.

Certainly, the perception of substance over form is no novelty in this area of the law. In Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945), the Court said:

> To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

In that case the Tax Court was affirmed in finding a sale by a corporation despite the form of a sale by stockholders. Other cases reflect similar analysis, whether divining the substance benefited the taxpayer, see Frelbro Corp. v. Commissioner of Internal Revenue, 315 F.2d 784, 786 (2d Cir. 1963), or the Commissioner. In Gilbert v. Commissioner of Internal Revenue, 262 F.2d 512 (2d Cir.), cert. denied, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959), this court affirmed the conclusion of the Tax Court that advances to a corporation—though in form loans—were in substance capital contributions. Accord, American-La France-Foamite Corp. v. Commissioner of Internal Revenue, 284 F.2d 723 (2d Cir. 1960), cert. denied, 365 U.S. 881, 81 S.Ct. 1031, 6 L.Ed.2d 192 (1961). Similarly, in Raleigh Properties, Inc., 21 CCH Tax Ct.Mem. 812 (1962), appeal to 4th Cir. dismissed by stipulation (Apr. 19, 1963), a buyer at an inflated "price" to be paid over eleven years received the benefit of an interest deduction for that part of the "price" which was in substance interest for use of the remainder of the "purchase price."[11] Here, Zeckendorf "sold" shares of stock and "bought" them back seven months later at a price of more than $872,000.00[12] over the original price. By analogy, it is a permissible—even persuasive—inference that the substantial increase in price (fixed in advance) in such a short period was to compensate for the use of over eight million dollars.

Moreover, the fact that Zeckendorf had no formal legal obligation to Comtel to repay the money used does not necessarily prevent characterizing the transaction as essentially a loan. Loans are not unknown in which the lender agrees, in the event of default, to look only to collateral for repayment, and not to the borrower. The computations offered by petitioners are designed to show that there was no economic compulsion on Zeckendorf to exercise the option; according to those figures, if the value of the Commodore shares remained the same between February 1958 (grant of option) and September 1958 (exercise of option), exercising the option cost Zeckendorf more money than letting it lapse. But if this were the only—or the most significant—consideration, Zeckendorf would not have obtained the option in the first place. What the computations ignore and what the Tax Court recognized is that Zeckendorf wanted the Hotel Commodore—obviously because of its potential—and never intended to give it up.

■■ The Tax Court had the power —indeed the duty—to look to the substance of this transaction; it viewed Comtel as having the real business purpose of converting a loan with security, which would produce interest income, into a hoped-for nonrecognition situation under section 337 and ultimately a capital gain. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596

11. Conversely, the seller in the same transaction lost in an attempt to establish a capital gain for the full amount in Estate of Berry, 43 T.C. 723 (1965), aff'd per curiam, 372 F.2d 476 (6th Cir. 1967).

12. Or approximately $730,000 net to Zeckendorf after Comtel's liquidation distribution.

(1935). Each of these cases must turn on its own facts and the decision of the Tax Court on these was not unjustified. Cf. Green v. Commissioner of Internal Revenue, 367 F.2d 823 (7th Cir. 1966), affirming the Tax Court on analogous facts. We have considered all of petitioners' arguments and authorities. Looking at the "total effect" of what occurred, see Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 266–267, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958), we do not feel that the Tax Court was wrong in characterizing the entire transaction as not a sale, but a short-term financing scheme in which Comtel received ordinary income.

■ Petitioners also argue that even if the transaction is properly regarded as a loan by Comtel to Zeckendorf of $8,264,000 in February 1958, and a promise by Zeckendorf to pay Comtel $9,136,000 in September, there would still be no interest income to Comtel. Their theory is that Zeckendorf would have issued its obligation of $9,136,000 at a discount of $872,000, and Comtel's $872,000 gain would be original issue discount under section 1232(b) (1). They go on to argue that since original issue discount is considered "gain from the sale or exchange of property," original issue discount is gain subject to nonrecognition under section 337. This point was not raised by petitioners in the full proceedings below, even on their motions for review by the full Tax Court or for reconsideration. Moreover, petitioners devote but a paragraph of their twenty-two page brief [13] in bare bone explication and cite no authority in support of their novel contention. Under these circumstances, we feel justified in not considering the matter further. See Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941); Jockmus v. United States, 335 F.2d 23, 30 (2d Cir. 1964); Dall v. Commissioner of Internal Revenue, 228 F.2d 526 (2d Cir. 1955) (*per curiam*).

Judgment affirmed.

---

13. And not a line in their reply brief.