PENN-DIXIE STEEL CORPORATION (AS SUCCESSOR TO CONTINENTAL STEEL CORPORATION), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4097–75.     Filed February 27, 1978.

*John Y. Taggart* and *Mel Jack Duksin,* for the petitioner.
*Powell W. Holly, Jr.,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency of $574,795 in the Federal income tax for the taxable year ending January 1, 1972, of petitioner's predecessor.

The issues remaining for our decision are: (1) Whether a 1968 transaction between petitioner's predecessor and another corporation constituted a sale with a deferred payment, entitling the predecessor to a deduction for imputed interest under section 483;[1] and (2) whether the predecessor's failure fully to comply with respondent's regulations precludes qualification for rapid amortization of pollution control facilities under section 169.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are incorporated herein by this reference.

The petitioner, Penn-Dixie Steel Corp. (petitioner), is the successor by merger on May 11, 1973, to Continental Steel Corp. (Continental). It had its principal place of business of Kokomo, Ind., at the time of the filing of the petition herein. The return for the year in question was filed with the Internal Revenue Service Center, Memphis, Tenn., on September 18, 1972. An amendment to that return to submit certain pollution control data was filed on April 3, 1975, with the same Service Center.

Phoenix Manufacturing Co. (Old Phoenix), a division of Union Tank Car Co. (Union), was engaged in the business of producing bars reinforcing concrete and merchant bar products such as flats, rounds, angles, channels, and squares. A continuous supply of steel billets was essential to this business. Continental, which manufactured and sold steel products, including billets, rods, merchant bars, nails, fences, welded fabric, and a variety of industrial wire sizes and finishes, had an excess of semifinished steel in the form of steel billets. Old Phoenix could guarantee a permanent market for that excess steel.

Continental and Union entered an agreement entitled "Joint Venture Agreement" on July 1, 1968, which closed on July 31, 1968. Pursuant to this agreement, a new corporation named Phoenix Manufacturing Co. (Phoenix) was formed. Union transferred to Phoenix assets and liabilities of Old Phoenix having a net value of $17 million in exchange for 50 percent of

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question.

the stock and an $8.5 million 7-percent debenture due July 31, 1974. Continental made a capital contribution of $8.5 million to Phoenix and received 50 percent of the stock. The treasurer of Phoenix was to invest and reinvest this cash in the highest yielding securities consistent with safety and the maturity date of the Phoenix debenture held by Union. In addition, Continental agreed to enter into a supply contract with Phoenix.

The July 1, 1968, agreement also provided for a put and call. During the period August 1, 1970, to July 31, 1971, Union could put to Continental its Phoenix stock for $8.5 million plus 125 percent of one-half the undistributed profits. Continental could call Union's stock in Phoenix on the same terms during the following year, beginning August 1, 1971, and ending July 31, 1972. The provision regarding undistributed profits was intended to operate as a penalty if profits were not distributed. If neither the put nor call were exercised, both parties would have a right of first refusal to the other party's stock in Phoenix.

Continental would have preferred an outright purchase of Old Phoenix, but Union was unwilling to modify the basic structure of its proposal. Union had considered selling Old Phoenix, but had rejected that option in favor of the joint venture structure in order to (1) avoid capital gains tax by qualifying for tax-free treatment under section 351 and (2) gradually phase in the decline in earnings resulting from the loss of Old Phoenix. Continental accepted Union's terms because Old Phoenix was so well suited to Continental's needs.

The Phoenix board of directors was composed of three representatives of Continental (its president, vice president and treasurer, and secretary) and three representatives of Union (its president and two high-level executives). The secretary of Phoenix was also the secretary of Continental and the treasurer of Phoenix was also the treasurer of Union.

Sometime after July 31, 1968, Penn-Dixie acquired control of Continental. Because Union was concerned that Penn-Dixie was in poor financial condition, its treasurer caused Phoenix as of November 23, 1970, to invest in an $8.5 million 8¾-percent debenture due July 31, 1974, issued by Union.

On February 24, 1971, Continental, Union, and Phoenix executed a supplement to the joint venture agreement of July 1, 1968, and an escrow agreement. Pursuant thereto, Union exercised its put, thereby transferring its 50-percent stock

interest in Phoenix to Continental, effective July 31, 1971. Continental purchased the stock by the following series of transactions. The $8.5 million Union 8¾-percent debenture due July 31, 1974, was modified to provide, among other things, for 7-percent interest (8¾ percent prior to February 1, 1971) and a due date of July 31, 1971. Continental executed an interest-free promissory note, in the principal amount of $8.5 million, payable to Phoenix on July 31, 1974, and Phoenix agreed to accept said note in full satisfaction of the modified $8.5 million Union debenture. The net effect of the foregoing transactions was that Phoenix held Continental's $8.5 million note and Continental owned 100 percent of the Phoenix stock. Union continued to hold the $8.5 million Phoenix debenture issued on the original incorporation of Phoenix.

During the taxable year ending January 1, 1972, Continental expended $379,140 for pollution control facilities. Continental purported to make an election to amortize these facilities under section 169, attaching a statement to that effect to its return for such taxable year together with a letter from the Indiana Stream Pollution Control Board dated May 19, 1970, approving the plans and specifications of Continental's pollution control facilities and a letter of June 24, 1971, to the Indiana State Board of Health describing said facilities and their characteristics and reporting on the progress made in putting them into operation. Continental did not attach a statement that the facilities had been certified by the Federal certifying authority or a statement that application had been made to the proper certifying authorities and copies of any such applications. Such applications had not then been made and were not made until early 1973. The United States Environmental Protection Agency application forms were not available until at least 1 year after the final promulgation of the Treasury regulations under section 169 on May 21, 1971.

Certification was received from the Stream Pollution Control Board of the State of Indiana on October 24, 1973, and from the Environmental Protection Agency on November 5, 1973. These documents were brought to the attention of the Internal Revenue Service Appellate Conferee on March 4, 1974, or April 25, 1974. On March 31, 1975, petitioner filed an amended Federal income tax return, supplying copies of the Federal certification and application therefor and the State certification.

## OPINION

The first issue is whether the 1968 transaction between Union and Continental constituted a sale to Continental of Union's entire interest in Old Phoenix with payment of one-half the purchase price deferred for 2 or 3 years. The parties agree that if it was a sale, Continental is entitled to an imputed interest deduction of $1,170,450 under section 483. Petitioner, while conceding that Continental's 1968 transaction with Union did not constitute a sale for commercial purposes, contends that it nevertheless constituted a sale for tax purposes in that it shifted the burdens and benefits of full ownership from Union to Continental. Cf. *Merrill v. Commissioner*, 40 T.C. 66, 74 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964).

It cannot be gainsaid that, in form, the transaction herein did not constitute a sale. Rather, it envisaged the creation of a corporation, intended to satisfy the requirements of section 351, to which assets and liabilities of Old Phoenix and $8.5 million cash from Continental were transferred in exchange for stock and a debenture and in which the equity ownership was given to Continental and Union equally. By the terms of the 1968 agreement, ultimate ownership of the entire equity of Phoenix was to be acquired by Continental if and when Union exercised its put or Continental exercised its call. Thus, in form, Phoenix acquired the assets and liabilities of Old Phoenix from Union in exchange for stock and securities and Continental acquired half of Phoenix's stock in exchange for cash with the opportunity to acquire the other half at a future date.

Petitioner would have us telescope the transaction and consider that Continental acquired all of the assets and liabilities of Old Phoenix from Union in 1968, which it then transferred to Phoenix in exchange for all the stock of Phoenix (Union being given 50 percent of the stock as security for Continental's obligations to it), and paid Union in two installments, the first installment being the transfer to Union of $8.5 million in cash which Union then invested in the Phoenix debenture. Where petitioner finds the second installment is less clear. Presumably, it would have us reconstruct the July 31, 1971, transaction, so as to treat Union as having paid Phoenix $8.5 million in satisfaction of the Union debenture, as modified, to view Phoenix as having lent the $8.5 million to Continental, receiving back the non-interest-bearing note payable on July 31, 1974, and to treat

Continental as using this cash to make the second installment payment to Union.[2]

The parties have locked horns on the issue of whether Union made a completed sale of Old Phoenix to Continental in 1968. In considering this issue, we are mindful of the time-honored principle that the substance and not the form of the transaction is determinative (see *Russo v. Commissioner*, 68 T.C. 135, 143 (1977)) and that we should "look to all the facts and surrounding circumstances to determine the intent of the parties as revealed in their actions and statements, and the economic realities of the transaction." See *Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836, 845 (1972), affd. per curiam 500 F.2d 1222 (9th Cir. 1974). At the same time, we are not unmindful that the transaction herein was structured in an arm's-length transaction between unrelated parties and had obvious tax consequences, beyond the issue involved herein, to Union and a third party (Phonex) who are not before us in this proceeding. Cf. *Freeport Transport, Inc. v. Commissioner*, 63 T.C. 107 (1974). In such a situation, we should proceed with caution and seek strong proof[3] from the party to the transaction who asks us to accede to blandishments that its form be ignored. See *Estate of Rogers v. Commissioner*, 445 F.2d 1020, 1021–1022 (2nd Cir. 1971), affg. per curiam T.C. Memo. 1970–192; *Russo v. Commissioner, supra* at 143–144.

Petitioner seeks to have us hold that the benefits and burdens of ownership of Old Phoenix passed to Continental in 1968 and that in reality Phoenix—to which the assets and liabilities of Old Phoenix were transferred—was nothing more than a complacent

---

[2]An alternative reconstruction could view the non-interest-bearing note as having been constructively delivered by Continental to Union and used by Union to satisfy its debenture obligation to Phoenix. Such a reconstruction raises an issue that neither party addressed, namely, the right of Continental to obtain an imputed interest deduction under sec. 483 in light of the fact that the claimed second installment was paid by delivery of a non-interest-bearing note in favor of Phoenix which was not due until July 31, 1974—3 years after the taxable year before us. Clearly, this fact raises a question as to whether, in any event, "payment" of such imputed interest was made during such taxable year within the meaning of sec. 483 (see sec. 483(c)(2); sec. 1.483–1(b)(5), Income Tax Regs.; *Williams Co. v. Commissioner*, 429 U.S. 569 (1977)) or, if such "payment" was made, whether the imputed interest should be allocated over the period from the date of its delivery to the due date or date it may have actually been paid (see *Rubnitz v. Commissioner*, 67 T.C. 621, 628 and n.8 (1977)). Under the circumstances and in view of our ultimate decision that respondent should in any event prevail, we do not reach this issue and do not express any opinion, directly or indirectly, as to how it should be resolved. We also note that the same problems may be involved in the presumed reconstruction set forth in the body of this opinion in view of the fact that no cash ever actually passed from Continental to Union in respect of the second installment.

[3]See *Peerless Equipment Co. v. Commissioner*, T.C. Memo. 1967–181.

creature of Continental in carrying out the latter's bidding. The facts simply belie petitioner's contention. The documentation herein is replete with references to the existence of a "joint venture." Union and Continental shared stock ownership of Phoenix. They had equal representation on the Phoenix board of directors. Both in theory and in fact, they shared in Phoenix's earnings until Continental acquired the full stock ownership in 1971. To be sure, Continental seems to have taken the lead in the conduct of Phoenix's operations, but the evidence in this regard falls far short of proving that Phoenix was Continental's amanuensis in the conduct of Phoenix's business.[4]

Petitioner also seeks to fit the instant case to the mold of situations where title remains in the seller as security for the purchase price. See *Clodfelter v. Commissioner*, 48 T.C. 694, 700 (1967), affd. 426 F.2d 1391 (9th Cir. 1970).[5] Thus, petitioner points out that Continental's $8.5 million capital contribution was not part of Phoenix's working capital but, rather, was invested in securities by the treasurer of Phoenix, who was also the treasurer of Union, the implication being that the arrangement was designed to protect the purchase price. But, this is too thin a reed to support petitioner's claim of a mere security arrangement, particularly in light of the fact that Union received, as its own, a share of the net profits and controlled half the seats on the board of directors.

Petitioner seeks to buttress its position by arguing that the possibility that the put or call would not be exercised was so remote that it should be ignored. It argues that the price set at the outset would prove to be advantageous to one party or the other. Thus, if Phoenix was not successful, Union would exercise its put. Similarly, if Phoenix prospered, Continental would exercise its call. We disagree.

Admittedly, every remote contingency and condition need not be satisfied before a sale is deemed to occur. *Herbert J.*

---

[4]Grasping at straws, petitioner seeks to persuade us of Continental's overriding control over Phoenix by evidence that usually Union deferred to Continental in the conduct of operations of Phoenix and that Phoenix's accounting system was designed so as to be compatible with that of Continental. We are unimpressed.

[5]See also *White v. Commissioner*, T.C. Memo. 1974–69.

*Investment Corp. v. United States*, 360 F. Supp. 825 (E.D. Wis. 1973), affd. per curiam 500 F.2d 44 (7th Cir. 1974).[6] But, we are not convinced that there was a sufficient certainty that the put and call would be exercised even if we were to consider such a certainty sufficient to find a sale under all the circumstances herein. Assuming without deciding that a different result might obtain if the put and call were exercisable and expired on the same date (see Rev. Rul. 72–543, 1972–2 C.B. 87), the fact of the matter is that a 1-year period would elapse from the date Union's put expired to the date when Continental's call expired. Further, more than 3 years could elapse from the time the joint venture agreement was signed to the date Union's put expired and more than 4 years until Continental's call expired.

We recognize that Continental would have preferred to purchase Old Phoenix outright and would probably not have accepted Union's offer had it not included a call which enabled Continental eventually to acquire 100-percent ownership. Nor do we doubt that, at the time of the 1968 transaction, Continental intended to exercise its call if Union did not exercise its put. But, we are not convinced that such plans would not be subject to reevaluation in light of changing circumstances. We consider it more than a remote possibility that Phoenix might so prosper in the first 3 years that Union would forego the exercise of its put and that the economic outlook for the steel industry could then change sufficiently in the following year to lead Continental to decide not to exercise its call. Alternatively, changes in Continental's own situation might well lead to a change in its position with respect to its call.[7] Finally, it seems likely that Continental would have resisted Union's attempt to exercise its put if Phoenix's plant had been destroyed in the interim.

In short, the put and call arrangement did not legally, or as a practical matter, impose mutual obligations on Union to sell and on Continental to buy. See *Koch v. Commissioner*, 67 T.C. 71, 82 (1976) (agreement was option, not sale). To be sure, neither

---

[6]See also *Perry v. Commissioner*, T.C. Memo. 1976–381. Cf. *Beaudry v. Commissioner*, T.C. Memo. 1972–214, holding that a lease with an option to buy did not constitute a sale, in part, because economic factors did not indicate that the option would necessarily be exercised.

[7]A memorandum of the initial stages of negotiations between Continental and Union, dated June 14, 1968, and prepared by the president of Continental, contained the following statement:

"At the end of two years, UTC could have right to force us to buy other half. At end of three years, we can compel sale. If neither demand is made, joint venture would continue."

party could unilaterally withdraw and prevent a sale, see *Wisconsin Electric Power Co. v. Commissioner*, 18 T.C. 400 (1952), but each party's obligation to act was contingent upon exercise of the put or call, an event which might well fail to occur. See *Hoven v. Commissioner*, 56 T.C. 50 (1971).

The factual situation herein does not even begin to approach the unconditional nature of the obligation involved in *Bradford v. United States*, 444 F.2d 1133 (Ct. Cl. 1971), relied upon by petitioner. The same is true, although perhaps to a lesser degree, of *Comtel Corp. v. Commissioner*, 376 F.2d 791 (2d Cir. 1967), affg. 45 T.C. 294 (1965), also relied upon by petitioner, in which the Court of Appeals significantly observed that each case "must turn on its own facts" (see 376 F.2d at 797). The numerous other cases cited by petitioner are similarly distinguishable.

In sum, while we are left with the definite impression that both parties anticipated that Continental would eventually acquire full ownership of Phoenix, the intent to sell is not synonymous with a sale. See *Hoven v. Commissioner, supra; United States Industrial Alcohol Co. v. Helvering*, 137 F.2d 511, 515–516 (2d Cir. 1943), revg. in part 42 B.T.A. 1323 (1940), accepted as to this point in *Woodlawn Park Cemetery Co.*, 16 T.C. 1067, 1079 (1951), and *Wurtsbaugh v. Commissioner*, 8 T.C. 183, 189–190 (1947). The July 1, 1968, transaction simply did not sufficiently commit the parties to constitute a sale.

The second issue is whether Continental was entitled to rapid amortization of pollution control facilities under section 169. In order to elect such a deduction, section 1.169–4(a)(1), Income Tax Regs., requires that a taxpayer attach a statement to that effect to its return including, among other information, the following:

(ix)(a) A statement that the facility has been certified by the Federal certifying authority, together with a copy of such certification, and a copy of the application for certification which was filed with and approved by the Federal certifying authority or (b), if the facility has not been certified by the Federal certifying authority, a statement that application has been made to the proper State certifying authority * * * together with a copy of such application and * * * a copy of the application filed or to be filed with the Federal certifying authority.

The regulations further provide that a taxpayer who does not make an election in the prescribed manner shall not be entitled to a deduction under section 169. Sec. 1.169–4(a)(3), Income Tax

Regs. The parties agree that Continental failed to comply with the above-quoted portion of the regulations,[8] but disagree as to the effect of such failure.

Initially, petitioner suggests that Continental was unable to comply with respondent's regulations because the necessary forms were not available when it filed its return. Although we have found, and the parties agree, that the necessary forms were not available for about a year after the promulgation of the regulations in May 1971, petitioner has failed to show that the forms were not available by September 1972, when Continental filed its return. Rule 142(a), Tax Court Rules of Practice and Procedure. Moreover, Continental did obtain and file with its original return the necessary certification documents for pollution control facilities of its newly acquired subsidiary, Phoenix. We think it apparent that Continental was able to comply with the regulations.

We turn now to petitioner's contention that the statement and documents attached to Continental's return were sufficient to constitute an election under section 169. Petitioner relies on a line of cases decided by this Court, which hold that substantial compliance with a regulation is sufficient when the regulation requires a procedural detail that does not go to the essence of the statute. See *Hewlett-Packard Co. v. Commissioner*, 67 T.C. 736 (1977); *Columbia Iron & Metal Co. v. Commissioner*, 61 T.C. 5 (1973), and cases cited therein. But, a requirement that goes to the essence of a statute is mandatory and must be met. See *Sperapani v. Commissioner*, 42 T.C. 308, 331–332 (1964).

We disagree with petitioner's assertion that Continental has only failed to comply with a procedural detail. While the actual filing of a copy of the required certification or application therefor may be a procedural detail, the implicit requirement that such an application must have been made goes to the very essence of the statute.

The essential prerequisite to rapid amortization under section

---

[8]The regulations were issued pursuant to the following provision of sec. 169:

(b) ELECTION OF AMORTIZATION.—The election of the taxpayer to take the amortization deduction and to begin the 60-month period with the month following the month in which the facility is completed or acquired, or with the taxable year succeeding the taxable year in which such facility is completed or acquired, shall be made by filing with the Secretary or his delegate in such manner, in such form, and within such time, as the Secretary may by regulations prescribes, a statement of such election.

169 is that the taxpayer's pollution control facility must be certified. Although a literal reading of the statute might require a taxpayer to obtain certification as a prerequisite to the election under section 169, respondent's regulations, perhaps in recognition of the practical difficulties presented by such a reading, require only proof that application for certification has been made. The underlying requirement that such an application, in fact, be made before the return is filed relates to the essential qualification for election under section 169 and cannot be dismissed as a mere procedural detail.

It cannot be gainsaid that Continental acquired pollution control facilities during the taxable year in question which were eventually properly certified. But, the fact remains that it did not comply with the requirements of respondent's regulations. The regulations were promulgated under specific legislative authority contained in section 169(b) and are not "unreasonable and plainly inconsistent with the revenue statutes." See *Commissioner v. South Texas Co.*, 333 U.S. 496, 501 (1948). See also *Bingler v. Johnson*, 394 U.S. 741, 749–750 (1969); *Occidental Petroleum Corp. v. Commissioner*, 55 T.C. 115, 122–123 (1970). Continental not only did not comply with the regulations in respect of the required information submitted with its election but did not accomplish the substantive underlying act which was a necessary precondition to its ability to comply. Thus, this is not a case where the taxpayer has fulfilled all underlying requirements but failed to file evidence of such facts. See *Columbia Iron & Metal Co. v. Commissioner, supra.* Nor is it a case where the taxpayer's failure is only an oversight or mistake which was corrected immediately after discovery. *Haft Trust v. Commissioner*, 61 T.C. 398 (1973); *Cary v. Commissioner*, 41 T.C. 214 (1963); *Reaver v. Commissioner*, 42 T.C. 72 (1964). We are satisfied that Continental was fully aware of the requirement of certification applications to the authorities because the statement attached to its return tracked the regulations, and the statement with respect to its subsidiary Phoenix met all requirements of the regulations, including the requisite information omitted from its own statement. See also p. 846, *supra.* Yet, Continental did not file applications for certification until 1973.[9]

---

[9]Although the parties have stipulated that petitioner made the requisite applications in early 1973, we note that the application to the Environmental Protection Agency, attached to petitioner's amended return, is dated June 29, 1973.

When certification was received, petitioner failed to comply with respondent's regulations that certification be filed with the Internal Revenue Service within 90 days of receipt. Sec. 1.169–4(a)(1), Income Tax Regs. If there is an explanation for these failures, it does not appear from the record.

We are aware that the result we reach is not compelled by the statutory language. See *Dunavant v. Commissioner*, 63 T.C. 316 (1974) (denied election under section 333 because failed to file election within 30 days as required by statute); *Gray v. Commissioner*, 16 T.C. 262 (1951) (denied rapid amortization for emergency facility because application not made within time required by section 124 of the 1939 Code). Yet we think the central importance of certification to section 169, petitioner's failure to provide a reasonable explanation for its and Continental's noncompliance with the regulations, and its failure to correct the error promptly justify our decision that it should not be entitled to the benefits of that section insofar as the pollution control facilities involved herein are concerned.

*Decision will be entered under Rule 155.*