**William J. O'HARE and Patricia E. O'Hare, Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 234, Docket 80–4103.**

United States Court of Appeals, Second Circuit.

Argued Oct. 16, 1980.

Decided Feb. 24, 1981.

Mickey A. Steiman, Poughkeepsie, N. Y. (William J. O'Hare, Poughkeepsie, N. Y., of counsel), for appellants.

William A. Friedlander, Tax Div., Dept. of Justice, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Michael L. Paup, Richard Farber, Tax Div., Dept. of Justice, Washington, D. C., of counsel), for appellee.

Before FRIENDLY, MANSFIELD and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

William and Patricia O'Hare appeal a decision of the United States Tax Court, Quealy, J., upholding a deficiency assessment of $10,131 for the taxable year 1974.[1] The sole question on this appeal is whether $40,000 received in connection with the sale of certain property should be taxed as ordinary income or long term capital gain. The Tax Court determined that under the circumstances the money should be treated as ordinary income. We affirm.

## BACKGROUND

The relevant facts are fully set forth in the opinion of the Tax Court and are largely undisputed here. During the years 1973 and 1974, IX Investors, Inc. (Investors) was a New York corporation engaged in the business of buying and selling real estate. In late 1973 Investors entered into a contract to buy an upstate New York farm for $248,000. Investors made a down payment of $24,800 and immediately began searching

for financing for the balance. When Investors encountered difficulty in finding a lender, Richard Dean, its president, approached O'Hare, the company's lawyer, and stated that Investors was willing to pay up to $70,000 "off the top" of the sale proceeds to anyone providing financing for the farm. Shortly thereafter, a local New York bank indicated that it would be interested in providing the financing, but, in light of Investors' financial statement, insisted that someone of "sufficient net worth" cosign the mortgage note. At the request of Investors, O'Hare agreed to cosign the note. But after reviewing O'Hare's financial statement, the bank decided to require O'Hare personally to take title to the property. Accordingly, on December 28, 1973, Investors and O'Hare executed an agreement to enable O'Hare to take title while Investors searched for a buyer, and to provide for transfer after that event. This agreement spawned the present dispute.[2]

Under the terms of the agreement, Investors agreed to assign to O'Hare its right to

---

1. Patricia O'Hare is an appellant here solely because she filed a joint return with her husband, William. For simplicity, the claims of William (hereinafter referred to as "O'Hare" or "taxpayer") will be treated as the claims of both.

2. The agreement provided in pertinent part as follows:

WHEREAS, the party of the first part [Investors] in consideration of ONE DOLLAR and other valuable consideration hereby agree to assign their rights, interests and obligations in said contract to William J. O'Hare.

WHEREAS, the party of the first part and the party of the second part [O'Hare] have mutually agreed to the purchase and sale of this property in accordance with the understandings hereinafter mentioned, agree to the following:

1. That the party of the second part agrees to personally obtain and sign the necessary papers to personally attain a $200,000.00 mortgage on the above-mentioned property in its individual name.

2. That the party of the first part will pay at the time of the closing the difference between the purchase price of $248,000.00 minus the down-payment of $24,800.00 and all other expenses incidental to the closing of title, including but not limited to taxes, expenses for recording instruments, bank fees,

legal fees, and all other expenses to facilitate the transfer of title.

3. That the party of the second part will agree at the time of a future sale to reconvey the property back to the party of the first part on the following terms and conditions:

a. That if the property is reconveyed within a four (4) month period from the date of the closing from the Ferrys to William J. O'Hare, the party of the second part will reconvey the property upon the payment of $25,000.00 and the satisfaction of the $200,000.00 mortgage above-mentioned.

b. If the property is reconveyed within a four (4) to eight (8) month period, the party of the second part will reconvey the property upon the payment of $50,000.00 and the satisfaction of the $200,000.00 mortgage above-mentioned.

c. If the property is reconveyed after an eight (8) month period, the party of the second part will reconvey the property upon the payment of $75,000.00 and the satisfaction of the $200,000.00 mortgage above-mentioned.

4. That the party of the second part agrees and mutually promises with the party of the first part that he will not encumber the property above-mentioned with additional or new mortgages without the consent of both parties.

purchase the farm and O'Hare agreed to obtain in his own name a mortgage of $200,000 on the farm. When a third party buyer was found, O'Hare was to reconvey the property to Investors upon the latter's satisfaction of the mortgage and payment of a lump sum determined by the length of time the property was held: $25,000 if the property was sold within four months, $50,000 if sold between four and eight months, and $75,000 if sold after eight months. The payments to O'Hare were not contingent upon Investors' realizing a profit. No provision was made for sharing a loss. O'Hare was prohibited from encumbering the farm, other than by executing the $200,000 mortgage, without Investors' consent. Shortly after this agreement was entered into, O'Hare personally signed a $200,000 note to the bank, took title to the property, and executed a mortgage in favor of the bank to secure the note. Investors paid the transactional costs, including attorney's fees. Although the agreement was silent as to who was responsible for paying the mortgage interest and the taxes on the property, Investors in fact paid both.

In August 1974, Investors located a buyer and the property was sold for $335,000.[3] Although O'Hare was entitled by the terms of the agreement to keep $50,000, he agreed to settle for $40,000 so that Investors could realize some profit on its investment. On their joint return for 1974, the O'Hares reported the $40,000 as long term capital gain from the sale of a capital asset.[4] The IRS determined that the sum was a fee for obtaining financing and was therefore ordinary income. The Tax Court upheld the IRS, and O'Hare appeals.

## DISCUSSION

O'Hare concedes that the substance rather than the form of the transaction governs tax treatment, *see Commissioner v. Court Holding Company*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 567 (1945), but insists that the substance of this deal was "in the nature of a joint venture." In support of this position, O'Hare points out that the assignment did not indemnify him against liability for carrying charges on the property, nor against liability for accidents occurring on the property, nor against loss in the event Investors never sought or obtained a third party buyer. Investors would not sell unless it could realize a profit, and O'Hare would not receive any money unless Investors sold. O'Hare also claims that if the property was sold for less than $200,000, he would have had to use his own funds in addition to the sales proceeds to satisfy the mortgage. Thus, O'Hare argues, he was sufficiently involved with the profitability of the venture to warrant treatment as a joint venturer.

The Tax Court was unimpressed with these arguments. Finding that O'Hare "never had any intention of buying the property in his own right," the court concluded that he took title to the property only because that was a requirement of the loan transaction. He contributed none of his own funds, other than the loan which was obtained on the strength of his credit and which required no out-of-pocket expenditures. As for his risks, the Tax Court found them more imagined than real, and not materially different from those borne by other lenders. Finally, the court found that the payment schedule militated against a finding of co-ownership, since the fee was contingent upon the holding period rather than any gain resulting from the sale of the property. Thus, the court concluded that O'Hare "merely received a fee" for providing the funds to buy the property, and that the fee was taxable as ordinary income.

3. Although the agreement provided that Investors should buy the property from O'Hare and then sell to the buyer, the parties apparently decided to bypass this procedure by having O'Hare sell directly to the buyer. We do not feel that this short cut materially affects the legal issues here involved.

4. At the time of this transaction, the holding period for long term capital gain treatment was six months. *See* I.R.C. § 1222(3) (1974), subsequently amended by the Tax Reform Act of 1976, P.L. 94–455 (1976) (changing holding period from six months to nine months for calendar year 1977 and to one year effective after December 31, 1977).

The factual findings and inferences of the Tax Court are considered under a "quite restricted" standard of review and must be given "primary weight," *Commissioner v. Duberstein*, 363 U.S. 278, 289–91, 80 S.Ct. 1190, 1198–1199, 4 L.Ed.2d 1218 (1960), whereas its legal conclusions are entitled to no such deference. We decline to enter the debate of whether the assailed conclusions of the Tax Court were factual inferences or legal conclusions, *see Weddle v. Commissioner*, 325 F.2d 849, 851 (2d Cir. 1963), since we agree on both the facts and the law that the $40,000 was essentially a fee for the use of O'Hare's credit rather than "gain" from the sale of a capital asset. *See Comtel Corporation v. Commissioner*, 376 F.2d 791, 795–96 (2d Cir.), *cert. denied*, 389 U.S. 929, 88 S.Ct. 290, 19 L.Ed.2d 280 (1967).

We start with common ground. No one would dispute that if O'Hare had simply given his guarantee, as originally planned, and had received a fee for doing so, the money would be ordinary income. Nor could anyone seriously contend that the mere holding of legal title, without more, is sufficient to assure capital gain treatment. *See Comtel Corporation v. Commissioner*, *supra*, 376 F.2d at 796–97. Such a rule would exalt form over substance and would provide a ready means for those seeking to achieve the tax benefits of true investment without incurring the usual risks. Rather, the question is whether O'Hare's holding of title, together with his financial exposure in the event that the property was sold for less than $200,000, or, indeed, was never sold at all, essentially converted O'Hare from a mere guarantor into a joint venturer.

We think the Tax Court was amply justified in concluding that the claimed risks did not convert O'Hare into a joint venturer. O'Hare enjoyed a considerable measure of personal protection by virtue of the $48,000 which Investors had paid above the $200,000 mortgage. The extent of Investors' investment in the property surely helped minimize the risk that the company would simply walk away from the deal or fail to exercise due diligence in pursuing a third party buyer, and is an indication that it was thought unlikely that the property would be sold for less than $200,000. Furthermore, even though the assignment did not indicate that Investors would pay the carrying charges on the property, that Investors did pay these costs certainly suggests that this was in fact the understanding. Finally, the Tax Court was justified in inferring that the payment schedule undermined O'Hare's joint venture claim. It is hardly likely that a true owner or joint venturer would agree to an arrangement whereby his profit depended upon the timing of the sale rather than the amount of the proceeds of the sale. Such a payment mechanism clearly suggests a fee for the use of credit rather than a gain from the sale of property.

The present case is legally indistinguishable from *Comtel Corporation v. Commissioner*, *supra*, where this Court upheld the Tax Court's rejection of the taxpayer's capital gains argument. In *Comtel*, the Zeckendorf Corporation had the opportunity to acquire a controlling block of shares in the Hotel Commodore, but had been unable to secure financing. Zeckendorf eventually approached two potential lenders and, with them, formed the Comtel Corporation. Comtel then obtained a loan, Zeckendorf used the loan proceeds to buy the stock, and then Zeckendorf sold the stock to Comtel for the exact purchase price, retaining an option to repurchase the stock shortly after the capital gains holding period was satisfied. The "repurchase price" was to include Comtel's acquisition price, all of Comtel's expenses in the matter, including organizational and liquidation expenses, a six percent return on Comtel's capital investment, and a sizable lump sum. The arrangement went as planned: Zeckendorf found a new lender and repurchased the shares from Comtel. The Tax Court refused to recognize the elaborate scheme as a stock purchase and resale, holding that in substance the transactions were "merely steps in a complex, prearranged financing plan." 45 T.C. 294, 304 (1965).

In affirming, we placed particular emphasis on five findings of the Tax Court. First, Zeckendorf never wavered in its de-

sire to acquire the Commodore stock and never intended Comtel to displace it as the true owner. Second, the investors in Comtel Corporation were primarily interested in a high yield, low risk investment, rather than in hotel ownership or operation. Third, Comtel was not permitted to sell or dispose of the Commodore stock. Fourth, Comtel's profit depended solely on a prearranged option price, not on appreciation in the value of the stock. Fifth, the repurchase price had two variable components: Comtel's expenses in the matter and interest on principal—typical characteristics of compensation for the use of another's money.

The similarities to the present case are more than superficial. Like Comtel, O'Hare never intended to be more than a temporary accommodation holder of title to satisfy the loan requirements of the bank, and the extent of Investors' cash investment helped ensure that Investors would make every effort to see that O'Hare's intentions were realized. Investors continued to pay the carrying costs and to search for a buyer.[5] O'Hare's entirely passive role indicates that he did not intend to acquire the farm as a capital investment, but only as a means for obtaining compensation for his financial services. That O'Hare was not permitted to encumber the property and was not permitted to share in any of the profits above his prearranged fee militates against a finding that he was in essence a joint venturer. The only factual difference we see between this case and *Comtel* is that here O'Hare claimed that he assumed the risk of loss should the proceeds from the sale of the property fail to cover the mortgage principal. This does not change our conclusion, however, since, as the Tax Court noted, the risk assumed by O'Hare did not differ significantly from that assumed by a lender to a non-recourse borrower. Thus, the Tax Court was fully justified in inferring that the "total effect" of the real estate transaction here in question was that

of a financing scheme rather than a joint venture. *See Comtel Corporation v. Commissioner, supra,* 376 F.2d at 797.

Judgment affirmed.

MANSFIELD, Circuit Judge (dissenting):

I respectfully dissent. In my view the increased risks assumed by O'Hare as borrower from the bank and as titleholder of the property justify treatment of him as a joint venturer rather than as a guarantor or lender to whom a fee was to be paid for obtaining financing.

Had O'Hare remained a mere guarantor on a loan to Investors, any payment he received in compensation for that service would undoubtedly have been ordinary income. However, O'Hare's position as borrower and titleholder exposed him to risks from which he would have been immune as guarantor: (a) the risk that the property could not be sold or that it would be sold for less than $200,000, and (b) the risk that a large liability to a third party would arise from the property itself. In either of these events he would have had no right to reach the assets of Investors and its partners, something he could have done as guarantor.

The majority argues that these risks, although perhaps theoretically present, were properly dismissed by the Tax Court, because: (a) Investors' $48,000 investment in the property and its willingness to pick up the loan's carrying costs during the sale period minimized the chance that Investors would simply abandon O'Hare, and (b) the payment schedule adopted by the parties had the effect of eliminating the typical joint venturer's dependence on ultimate profitability.

With the benefit of hindsight, it is easy to argue that O'Hare's risks were minimal, and that Investors was so involved financially in the property that it was unlikely to abandon the venture. However, the risk element of O'Hare's position must be evaluated as of the time when he agreed to

---

5. O'Hare asserts, apparently for the first time, that he also actively sought a buyer. The record fails to disclose that he took any action in this regard, and indeed shows that he did no more than wait passively while Investors

sought a buyer. The Tax Court was fully justified in stating that the third party buyer was located "[a]s a result of the efforts of" Investors.

become borrower and titleholder, rather than after a successful sale was arranged. When the facts surrounding the deal are examined from this perspective, a very different picture emerges.

The venture proposed by Investors was considered so risky by the local financial community that Investors was unable to obtain financing from any source, even though "many institutions" and "many different people" were approached. Investors' offer to pay $70,000 to anyone who could arrange financing was also unsuccessful. When the Federal Land Bank finally agreed to make the loan, it refused to do so with O'Hare as guarantor, and instead required him to become solely liable on the note. This contemporaneous evaluation by a local expert that O'Hare's exposure to the bank would be significantly greater as borrower than as guarantor is strong evidence that the majority's retrospective assessment of the situation is erroneous. Moreover, Investors (recklessly, as it seemed to others at the time) had entered into a $248,000 purchase contract and made a $24,800 downpayment without first securing mortgage financing. Finally, at the time O'Hare agreed to take the property in his own name, there was no immediate prospect of a sale; in fact, it took Investors the better part of a year to sell the property in question. On this record, I fail to see how Judge Quealy could properly conclude that "resale and conveyance on terms negotiated by Investors was a practical certainty." It clearly was not. For these reasons the majority in my view errs in concluding that O'Hare was no more exposed as borrower and titleholder than he would have been as guarantor.

In relying on the payment schedule contained in the agreement between O'Hare and Investors, the majority also exalts form over substance. It is significant that the payment formula originally arrived at by

the parties was not observed in fact. Instead of paying O'Hare the $50,000 to which he would have been entitled under the formula, the parties instead agreed to lower O'Hare's payment to $40,000 specifically in order to allow Investors to show an adequate profit on the transaction. We should be governed in this matter by what the parties did, not by what they said they were going to do. Since the parties interpreted their own agreement as conditioning O'Hare's payment on the deal being profitable for both parties, I would conclude that the payment schedule was never intended by the parties to insulate O'Hare from the vagaries of the market.[1]

Perhaps the clearest proof that the Tax Court misinterpreted the factual situation presented by this case is its statement that O'Hare did not assume any increased risk of loss by becoming the borrower and titleholder because "petitioner's risk did not differ from that of any lender." Since a typical mortgage lender (such as the Federal Land Bank in this case) demands the personal guarantee of the buyer (or a prosperous guarantor) in addition to taking a security interest in the property being acquired, it is obvious that O'Hare's position as owner was *not* like that of a typical lender. If O'Hare had loaned $200,000 to Investors on a note and taken a security interest in the farm, Investors would have remained liable to him regardless of whether or not the farm was ever sold. By contrast, as owner of the property O'Hare had no right to proceed against anyone, and would have had to content himself with salvaging something from the farm itself if the proposed sale had never taken place.

The majority tries to explain away this error by suggesting that the Tax Court must have meant to say no more than that O'Hare's position as borrower was identical to that of a lender in a *non-recourse* situation. While this seems most unlikely, even

---

1. Even when the inquiry is limited to the language of the agreement itself, the evidence as to whether O'Hare's payment was meant to be tied to profitability is at least ambiguous: while specific payment figures are mentioned for each time period, the agreement also provides that, in the event the property is sold a piece at a time, O'Hare would receive upon each sale a "payment of his agreed *profits*." (Emphasis supplied). It is therefore not unreasonable to conclude that the parties understood from the beginning that O'Hare's payment would be conditioned upon the profitability of the transaction.

if we assume the non-recourse characterization *arguendo*,[2] it cuts strongly against the position adopted by the majority. O'Hare would have been far more secure as guarantor than as a non-recourse lender, because in the latter case O'Hare would have had no right over against the borrower but would have had his recovery limited to the resale value of the collateral itself. In the latter circumstances a default occurs when the collateral turns out to be worth less than what the borrower paid for it (and thus cannot be resold at a profit). Non-recourse lending therefore makes sense only where the collateral pledged is so easily disposed of at a price equal to or exceeding the amount of the loan that the addition of a personal or corporate guarantee would be superfluous. In contrast, under the circumstances of this case, where the "collateral" consists of land of dubious value, not easily liquidated, the position of a non-recourse lender would be hazardous in the extreme. Thus, if O'Hare were properly characterized as occupying a risk position no better than that of a non-recourse lender, his risk was sufficient to qualify him as a joint venturer.

The majority's reading of *Comtel* is unpersuasive. The first two factors relied on by the *Comtel* court focused on the sharp contrast which the court found between the short-term no-risk investment mentality of Comtel and the buy-and-hold spirit of Zeckendorf, a contrast which the court argued militated against capital gains treatment for the party with the more limited commitment.[3] Here, in contrast, neither party ever had any intention of going into the farming business. Both parties were seeking high-yield, risk-proof investments. The *Comtel* reasoning on these two points is therefore irrelevant.

With respect to the third factor relied on by the *Comtel* court, the fact that O'Hare did not have the right to encumber the farm at will prior to sale hardly proves that the transaction taken as a whole was not a joint venture. By prohibiting second mortgages on the farm, Investors was merely guaranteeing that O'Hare would not take personal advantage of what was really a joint asset and that the property would be available for immediate resale when the time came. This restriction on O'Hare's ownership of the farm was nothing more than a cautionary step taken by a prudent joint venturer. Since O'Hare makes no claim that the transaction was to be his alone, it is of no matter that his joint venturer was unwilling to place in O'Hare's hands the power to take improper advantage of his joint status.

The fourth factor in *Comtel* supports O'Hare's position here. Whereas Comtel's profit was precisely fixed and independent of any contingent event (since a complex network of subordination and indemnity agreements created a structure wherein the investors' "risk of loss was practically eliminated," 376 F.2d at 793), here the behavior of the parties clearly indicates that O'Hare's final payment was in fact tied to the profitability of the resale. Similarly, the fifth factor cannot be read as supporting the Government's position here, since Investors' obligation to repurchase was not of short duration and was not in fact viewed by the parties as depending exclusively on the passage of time. Whereas the holding period in *Comtel* was as long as seven months only because of the exigencies of the short-swing profits rules, here O'Hare's obligation was indefinite in nature. Even the payment schedule on which the majority places such emphasis was a far cry from the banker-style formula employed in *Comtel*. When one considers the fact that even the very rough payment schedule in the present case was altered by the parties in order to make the deal profitable for both, the contrast with *Comtel* becomes clear. Finally, whereas in *Comtel* Zeckendorf was as a practical matter com-

---

**2.** Note, however, that O'Hare's position here was in fact somewhat worse than that of a lender on a non-recourse note. Whereas a non-recourse lender faces no direct liability for claims arising out of the collateral prior to default and foreclosure, O'Hare's posture here was quite different, since to the rest of the world he was the owner of the property in question prior to sale.

**3.** There can be no dispute that at least one of the two parties to the transaction in the present case is entitled to capital gains treatment.

pelled to exercise its option, here a profitable resale was far from guaranteed, for reasons discussed above.

I am forced to conclude that the majority has misunderstood the extent of O'Hare's exposure prior to sale, and has distorted the *Comtel* analysis in order to fit the facts of this case. For the reasons stated I would reverse the Tax Court's decision.