T.C. Memo. 1999-181


UNITED STATES TAX COURT


ESTATE OF THEODORE J. CHAMBERLAIN, DECEASED,
DALE CHAMBERLAIN, PERSONAL REPRESENTATIVE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2999-97.                          Filed June 1, 1999.


Joseph Wetzel, Gary R. DeFrang, and Russell A. Sandor, for petitioner.

Gerald W. Douglas, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, Judge: Respondent determined a deficiency of $201,551 in Federal estate tax of the Estate of Theodore J. Chamberlain (decedent) and an accuracy-related penalty of $38,423 for negligence under section 6662(b)(1).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, including respondent's concession of the penalty, the sole issue remaining for decision is whether, for purposes of section 2518, decedent made a qualified disclaimer of property having a value of $455,753, or of any other amount, that otherwise would have passed to him from his predeceased spouse as part of the residue of her estate. We hold that decedent did not make a qualified disclaimer in any amount.

FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference. At decedent's death on February 26, 1994, he resided in Portland, Oregon. When the petition was filed, the personal representative, Dale Chamberlain (Dale), resided in Solana Beach, California.

Decedent was predeceased by his wife of 50 years, June L. Chamberlain, who died on December 7, 1992, at the age of 84. Decedent was appointed personal representative of Mrs. Chamberlain's estate on February 5, 1993. He served in that capacity until his death in February 1994 at the age of 87. Decedent and Mrs. Chamberlain had one child--Dale.

Decedent was a retired engineer who had spent most of his professional career working for the water department of the City of Portland. He had some responsibility for the design of the present Portland water system. Mrs. Chamberlain had been a high school language teacher. Although the Chamberlains were not employed in highly paid positions, they lived frugally, saved, and invested. As a result, they accumulated estates sufficient to justify estate planning.

In 1987, decedent and Mrs. Chamberlain hired the Portland law firm of Meyer & Wyse to handle their estate planning and to address their concerns about estate taxes. Roger Meyer and Joshua Kadish, both partners at Meyer & Wyse, worked on the planning and administration of the Chamberlains' estates, and the firm of Meyer & Wyse was the principal legal counsel for both estates. Mr. Meyer, the firm's senior partner, had known the Chamberlains for many years and used to be their next-door neighbor.

In broad outline, the estate plans of decedent and Mrs. Chamberlain were simple and consistent. Each wished the other to receive all or the bulk of his or her estate, and that, after both their deaths, Dale would inherit their property.

On January 14, 1988, Mr. Kadish wrote to decedent and Mrs. Chamberlain and explained the use of disclaimers as follows:

        At your request, we have revised our previous
    drafts to include a so-called Family Residuary Trust.
    This trust could also be called a "bypass" or
    "disclaimer" trust.  As I explained to you over the
    phone, it will allow the surviving spouse to analyze
    the family financial situation for a 9-month period
    following the deceased spouse's date of death.  The
    surviving spouse can then make a decision regarding how
    much money it would be prudent to direct into this
    trust for tax planning purposes.  The 9-month period
    gives the surviving spouse ample time to consult with
    us and other financial advisers and to make a decision.
    This type of arrangement allows maximum flexibility in
    formulating your estate plan.

What Mr. Kadish was referring to, of course, was the use of a

disclaimer by the survivor of the first to die to cause an amount

in the predeceasing spouse's estate up to the amount of the

unified credit to pass for the benefit of Dale and thus reduce

the taxable estate of the survivor for Federal estate tax

purposes.

    Relying on Mr. Kadish's advice that they did not have to

decide during their lifetimes whether to use the unified credit

in their wills, on January 25, 1988, decedent and Mrs.

Chamberlain executed the mutual wills[1] that Meyer & Wyse had

prepared for them.  These wills were consistent with the points

made by Mr. Kadish in his January 14, 1988, letter.  In her will,

Mrs. Chamberlain made a $75,000 specific bequest to Dale and

---

[1] The use of the term "mutual wills" does not imply that the
wills were executed pursuant to any type of contract.  See McGinn
v. Gilroy, 165 P.2d 73 (Or. 1946); Dukeminier & Johanson, Wills,
Trusts & Estates 292 (3d ed. 1984).

bequeathed the residue of her estate to decedent, if he should survive her. Her will provided, in the event of a disclaimer by decedent, that the disclaimed portion of the residuary estate would pass to the Family Residuary Trust. Under the terms of the Family Residuary Trust, decedent would be entitled during his lifetime to the trust's net income, as well as "such sums from the principal of the trust as the Trustee deems necessary or advisable for his health, education, support and maintenance to enable him to maintain the standard of living which he maintained in my lifetime" (the Support Power). At his death, the principal of the trust was to be distributed to the descendants of decedent and Mrs. Chamberlain. Mrs. Chamberlain's will provided that, should decedent disclaim his interest in the Family Residuary Trust, the disclaimed property would be distributed as if decedent had predeceased her. With the exception of Mrs. Chamberlain's specific bequest to Dale, decedent's will contained provisions that mirrored the provisions of Mrs. Chamberlain's will.

Within a week after Mrs. Chamberlain's death on December 7, 1992, decedent informed Mr. Meyer of Mrs. Chamberlain's death, and they began a series of conversations concerning Mrs. Chamberlain's estate. In those conversations, decedent expressed to Mr. Meyer his interest in minimizing the estate tax liability

of Mrs. Chamberlain's estate in order to maximize the value of the assets that would ultimately go to Dale.

On December 14, 1992, Mr. Meyer wrote the following in a memo (Exhibit 4-D) to Mr. Kadish:

> June Chamberlain passed away December 7.  I am going to meet with Ted [Chamberlain] on Saturday morning the 19th.  Please review the file and let me know what specific information, if any, we need.  I will try to get a listing of all property from him and bank accounts.  I understand everything is jointly held.  * * *

Mr. Kadish wrote his response to Mr. Meyer on Exhibit 4-D, below Mr. Meyer's text.  Mr. Kadish asked Mr. Meyer to "Get a precise list of all assets & debts and how they are held", reminded him that "We have 9 mos to disclaim", and advised that "I believe disclaimer of some types of jt property are now possible."

Subsequently, Mr. Meyer accompanied decedent to the bank to help him inventory the contents of decedent's and Mrs. Chamberlain's safe deposit box.  Decedent and Mr. Meyer organized the contents of the safe deposit box according to the type of ownership interest in each asset:  Assets owned outright by decedent; assets that had been held jointly by decedent and Mrs. Chamberlain; and assets that had been owned outright by Mrs. Chamberlain.

Shortly after Mrs. Chamberlain's death, decedent became preoccupied with his financial security and started taking a very cautious approach to the management of his financial affairs.

Decedent became hesitant to take any action concerning his financial affairs; such few actions that he did take were only after extensive consultation with Dale, and decedent made very few changes to his investments. Also, during 1993, decedent's health deteriorated to the point where he could no longer care for himself and required full-time help at home. However, decedent's mental acuity remained unimpaired; he was competent to execute a disclaimer at all relevant times.

In late December 1992 and early January 1993, decedent prepared 12 8½ x 14 inch pages (Exhibit 5-E) on which petitioner primarily relies to support the contention that decedent made a valid disclaimer under Oregon State law and section 2518. Exhibit 5-E was found by Mr. Wetzel, petitioner's trial counsel in this case, in the files of Meyer & Wyse, along with Exhibit 8-H, discussed infra. After this discovery, petitioner asserted that the pages found by Mr. Wetzel constitute decedent's written disclaimer. Only 5 of the 12 handwritten pages in Exhibit 5-E were originals--the remaining 7 pages were photocopies.[2] Four of the five original pages were handwritten by decedent on the reverse side of "Meals-on-Wheels" menus; another page was

---

[2] On some of the duplicates, decedent added information in blue ballpoint pen, but the additions are not material to the issues in this case.

handwritten and initialed by Dale on a sheet of paper from a yellow legal pad.  Moreover, although Exhibit 5-E comprises 12 pages, only 8 of the pages were different from each other (and 3 of those pages were photocopies)--the other 4 pages were duplicates.

Exhibit 5-E listed all property (consisting of securities, bank accounts, and the family residence) that decedent: (1) Owned outright; (2) was entitled to as surviving joint tenant; or (3) would receive as part of the residue of Mrs. Chamberlain's estate.  Five of the pages contain information on marketable securities, mostly bonds, and are organized by the months in which interest payments were to be received.  The first page, for example, was entitled "JANUARY & JULY TALLY 1992".  On each page, decedent drew several columns to record information about each security, including columns for the security name, account number, payment date, par value, interest rate, maturity, and location of the security.  There was also a column in which decedent marked each asset with a "T" "JT" or "J" to identify the original source of the asset.  Under the column headings, decedent grouped the securities into 3 headings:  Treasury, coupon, and registered.  The succeeding pages followed this same approach but contained two tables on each page, each covering two calendar months. The second page, for example, contained tables entitled "1993 FEB & AUGUST TALLY" and "MARCH SEPT".  None of the

pages were signed, but decedent had initialed and dated the bottom right corner of the first page "1/12/93".  The following is an example of the information presented in Exhibit 5-E for treasury bonds paying interest in January and July 1992:

JANUARY & JULY TALLY 1992

TREAS

| Payment Dates | Treas. Amount | | Time | Account No. | To Bank T.D. | |
|---------|---------|--------|---------|---------|---------|----|
| 1/16/92 | 20K | T.Bill | 52 week | 9900-xx | WSNB | JT |
| 1/23/92 | 80k | T.Bill | 26 week | 9900-xx | WSNB | JT |
| 1/23/92 | 45k | T.Bill | 26 week | 9900-xx | WSNB | J |
| 1/30/92 | 45k | T.Bill | 52 week | 4400-xx | WSNB | T |

Total =  190k TREASURIES

On or around January 1, 1993, when Dale was in Portland for the holidays, he sat down with decedent at the kitchen table to discuss decedent's estate plan and reviewed the first 5 pages of Exhibit 5-E.  Decedent had prepared Exhibit 5-E, identifying which assets had been Mrs. Chamberlain's property, which assets were decedent's property, and which assets were jointly owned by decedent and Mrs. Chamberlain, and discussed it with Dale as a step in effectuating his estate plan.  While reviewing Exhibit 5-E, decedent told Dale that he planned to disclaim the assets that were in Mrs. Chamberlain's name, which were marked on Exhibit 5-E with a "J".  On December 7, 1992, Mrs. Chamberlain's date of

death, the assets marked "J" on Exhibit 5-E by decedent had a fair market value of $257,745. Decedent failed to designate $13,100 of assets listed in Exhibit 5-E and designated an additional $48,247 and $29,818 worth of assets as "JT" and "T", respectively, that were subsequently listed on Mrs. Chamberlain's probate inventory ("Probate Inventory") (referred to collectively with Exhibit 5-E as "the Documents") as being part of her probate estate.

During Dale's visit to Portland, he and decedent jointly produced an additional 3 pages of Exhibit 5-E that reflect decedent's and Dale's efforts to determine the total value of decedent's and Mrs. Chamberlain's property. The first of these 3 pages, which is in decedent's handwriting, is entitled "TALLY". The top half of the page contains tables summarizing bank account, stock, and credit union information, with details similar to those found in the first 5 pages, such as account number or security name, ownership interest or value, and an identification of ownership. On the bottom half of the page, under the heading "DEC. 1992", decedent summarized the values of each type of asset in which he had an interest, such as "Treasuries", "Stock", and "House", and calculated a total value of $1,525,000. An additional page entitled "TALLY 12/29/92", contains totals for treasury, coupon, and registered bonds and appears to be the worksheet decedent used to determine the values

of the 3 categories of bonds that he used to calculate his gross assets. Both pages were initialed "TJC" and dated "1/1/93" in the top right corner.

The third page was written on a piece of paper from a yellow legal pad and is in Dale's handwriting, except the title "TOTAL WORTH 1992" and page number, which are in decedent's. On this page, under headings for "Treasuries", "Coupon Bonds", "Registered Bonds", "Bank Accounts" and Stock", Dale listed certain assets, identified them with a "T", "JT" or "J", and listed their values. In addition to the $257,745 worth of assets designated "J" by decedent, Dale designated an additional $149,799 worth of assets on this page as "J" assets that decedent had not previously identified as "J" assets. The top right corner of this page had been initialed "DGC" and dated "1/1/93" by Dale; it did not contain decedent's signature or initials. Throughout the pages of Exhibit 5-E, many items were marked or circled in various colors of pen and pencil. Some of the pages also bear reminder notes for decedent's use. For example, near the bottom of the first page, in blue pen, decedent wrote "Working On 2 8 1/23/93 TJC where is it?"[3] On another page,

_____

[3] The numbers "2" and "8" were circled and are decedent's abbreviations for February and August.

decedent wrote "CALL STATE 1-378-2881 FOR DOPE".[4]  On the page reporting bonds that paid interest in April and October, decedent wrote next to one of the entries:

> First Optional Call Date 4/1/2001
> Watch for Call Date
> Check with USNB

In March 1993, while Mr. Meyer was obtaining valuation figures for use in the Probate Inventory, Mr. Kadish prepared a disclaimer that he and Mr. Wyse had intended decedent to sign (Exhibit 8-H). Page 1 of Exhibit 8-H listed all the classes of Mrs. Chamberlain's property; page 2 of Exhibit 8-H stated a specific amount, $525,000, as being disclaimed.  Exhibit 8-H did not list any assets because Messrs. Meyer and Kadish planned to wait until the values of all of Mrs. Chamberlain's probate assets had been determined before deciding which assets to include in the disclaimer.  To that effect, in a memo to the June Chamberlain Probate File, Mr. Meyer wrote:

> Attached is the file.  You can see a very nice
> memorandum from John about disclaimers.  I will need
> to make up a total list of joint bonds as well, but we
> won't pick those up right now, but we're going to have
> to make a quick decision.  Let's get what were [sic]
> talking about, we'll value them and then see how many
> more we want to add to the pile.

---

[4] The area code for Portland, Oregon is "503."  The telephone number (503) 378-2881 is assigned to the Bond and Coupon Section of the Oregon State Treasury.

Exhibit 8-H also contained a provision that was designed to ensure that, if decedent should disclaim his survivorship interest in any joint tenancy property, it would not pass to him as part of the residue of Mrs. Chamberlain's estate:

> 3. To the extent that property passes by reason of this disclaimer to the residue of my deceased spouse's estate, and to the extent that I have an interest in the residue of my deceased spouse's estate pursuant to Section 5.1 of her Will, I hereby make the following further disclaimer with respect to the residuary provision of Section 5.1:
>
> I disclaim the right to receive the sum of $525,000 from the residue of my wife's estate, as provided in Section 5.1, and acknowledge that this disclaimed sum shall be distributed to the trustee, to be held as described in the Family Residuary Trust established in that section.

Due to inadvertence, Messrs. Meyer and Kadish never completed Exhibit 8-H by listing the assets to be disclaimed therein, and decedent never signed Exhibit 8-H or its equivalent. According to Mr. Meyer, "It was intended to have been done and wasn't done."

Other than Exhibit 8-H, no other document specifically identified as a written disclaimer was prepared by decedent or by anyone else on his behalf. None of the documents admitted into evidence, including the pages of Exhibit 5-E and the Probate Inventory refer to any specific disclaimed assets of any kind.

On April 30, 1993, acting in his capacity as personal representative of the Estate of Mrs. Chamberlain, decedent signed

the Probate Inventory and caused it to be filed with the local probate court, which was done in May 1993. The Probate Inventory had been prepared by Messrs. Meyer and Kadish with the assistance of decedent and listed the assets included in Mrs. Chamberlain's probate estate as valued on December 7, 1992, her date of death. Total values of the assets listed were as follows:

| | |
|---|---|
| Cash and equivalents | $248,195.87 |
| Bonds | 157,543.45 |
| Stocks | 69,581.63 |
| Total inventory | 475,320.95 |

The Probate Inventory filed with the probate court did not refer to any disclaimer of any assets by decedent.

On September 30, 1993, a Federal estate tax return, Form 706, was filed with the Internal Revenue Service by decedent on behalf of the Estate of Mrs. Chamberlain.[5] On the Form 706, Line 1, decedent reported a gross estate of $883,006, including $385,319 of jointly owned property, and on Line 2, total allowable deductions of $390,245, which included a marital deduction of $385,319. Decedent reported a taxable estate of $492,761 and calculated a tentative tax of $153,339 and an allowable unified credit of $192,800. Subtraction of the allowable unified credit from the tentative tax amount produced

---

[5] The Form 706 was due Sept. 7, 1993. See sec. 20.6075-1, Estate Tax Regs. No extension request was filed, presumably because it was clear that Mrs. Chamberlain's estate would not be taxable because of the availability of the marital deduction and the unified credit.

an amount less than zero; accordingly, decedent reported zero estate tax liability on Line 27 of the Form 706 because the entire tentative tax had been absorbed by the unified credit.

In April 1994, subsequent to the death of decedent in February 1994, Mr. Meyer met in chambers with Judge Lee Johnson of the Oregon Circuit Court for Multnomah County, Probate Department, to discuss a proposed order of distribution for Mrs. Chamberlain's estate different from that provided by her will. Mrs. Chamberlain's will provided that the residue of her estate was to pass to decedent or, to the extent disclaimed, the Family Residuary Trust. Because decedent had died, Messrs. Meyer and Kadish considered it unnecessary to distribute the assets to a trust and then redistribute them from the trust to Dale. On April 8, 1994, the Probate Department of the Oregon Circuit Court for Multnomah County, in an order signed by Judge Johnson, authorized an order of distribution for Mrs. Chamberlain's estate under which all remaining assets of the estate, after payment of expenses, were to be distributed to Dale.

On November 21, 1994, a Federal estate tax return, Form 706, was timely filed with the Internal Revenue Service by petitioner, the estate of decedent. On the Form 706, line 1, petitioner reported a gross estate of $1,104,352. On part 5, of the Form 706, the recapitulation of the gross estate showed the following date of death value amounts:

| Schedule A -- Real Estate | $151,558 |
| Schedule B -- Stocks and Bonds | 129,337 |
| Schedule C -- Mortgages, Notes, and Cash | 818,707 |
| Schedule F -- Other Miscellaneous Property | 4,750 |
| Total gross estate | 1,104,352 |

On the Form 706, Line 2, the estate reported total allowable deductions of $56,678, and on Line 3, a taxable estate of $1,047,674. These amounts did not include the assets of Mrs. Chamberlain's estate that, petitioner claims, were disclaimed under section 2518, and passed directly to Dale from Mrs. Chamberlain's estate.

### ULTIMATE FINDINGS OF FACT

At no time did decedent execute a written disclaimer of any kind within the meaning of section 2518 or Oregon law.

At no time did decedent execute any written document by means of which he irrevocably refused to accept assets otherwise passing to him from the estate of Mrs. Chamberlain.

At no time did decedent execute a document that specifically identified any interest in property disclaimed by him.

### OPINION

The Chamberlains' estate plan provided that the bulk of the estate of the first of them to die would be bequeathed to the surviving spouse, and then to Dale after the death of the survivor. Because of the 100-percent marital deduction for property passing to the surviving spouse, such a plan by its terms fails to take advantage of the unified credit in the estate

of the first spouse to die.  This causes the taxable estate of the surviving spouse to be larger than it would have been if an amount equal to the unified credit in the estate of the first spouse to die had passed directly to the object or objects of their joint bounty.

The technique for using the unified credit in the estate of the first spouse to die that Meyer & Wyse discussed with decedent and Mrs. Chamberlain was to have the surviving spouse disclaim all or part of his or her interest in the estate of the first to die.  Using this technique would ensure that the unified credit would be fully used in the estates of both spouses.  By bequeathing the residuary estate to the surviving spouse and providing for the disposition of any property disclaimed, the wills enabled the surviving spouse, with the benefit of current asset valuations, to evaluate his or her financial needs and decide whether to disclaim, and if so, how much to disclaim, so as to use the unified credit to the extent consistent with his or her evaluation of his or her own needs.  See Manning et al. on Estate Planning, 2-63 through 2-64 (5th ed. 1998).

Petitioner contends that decedent disclaimed his interests in the probate property of Mrs. Chamberlain by substantially complying with section 2518 and Oregon law and should be treated as having never received the disclaimed interests for Federal estate tax purposes.  Respondent contends that decedent did not

make a qualified disclaimer under section 2518(b) or otherwise substantially comply with section 2518, so that the interests in property alleged to be disclaimed are properly included in decedent's gross estate.

I. Did Decedent Make a Qualified Disclaimer?

Section 2033 includes in the gross estate the value of all property to the extent of the interest of the decedent at the time of death. Section 2046 incorporates the provisions of section 2518, which governs disclaimers of property interests for Federal gift tax purposes. Under section 2046, a "qualified disclaimer" meeting the requirements of section 2518 results in the disclaimant's being treated as having never received the disclaimed interest in property for Federal estate tax purposes. Instead, as provided by section 25.2518-1(b), Gift Tax Regs., the interest is considered as passing directly to the persons entitled to receive the property as a result of the disclaimer.

Section 2518(a) provides that if a person makes a "qualified disclaimer with respect to any interest in property", Subtitle B (concerning estate and gift taxes) "shall apply with respect to such interest as if the interest had never been transferred to such person."

Section 2518(b) defines a "qualified disclaimer" as follows:

the term "qualified disclaimer" means an irrevocable
and unqualified refusal by a person to accept an
interest in property but only if--

(1)  such refusal is in writing,

(2)  such writing is received by the transferor of the interest, his legal representative, or the holder of the legal title to the property to which the interest relates not later than the date which is 9 months after the later of--

(A) the day on which the transfer creating the interest in such person is made, or

(B) the day on which such person attains age 21,

(3)  such person has not accepted the interest or any of its benefits, and

(4)  as a result of such refusal, the interest passes without any direction on the part of the person making the disclaimer and passes either--

(A) to the spouse of the decedent, or

(B) to a person other than the person making the disclaimer.

A.    Acceptance of Assets or Income

Decedent's compliance with section 2518(b)(3) is not at issue in this case because there is no evidence that decedent, acting in his personal capacity, accepted any of the assets in dispute or the income paid thereon.

B.    Passage of the Assets

Section 2518(b)(4) requires that the interest in property disclaimed pass without any direction on the part of the disclaimant to the decedent's spouse or a person other than the

disclaimant.  In the case at hand, if an effective disclaimer had occurred, the interests in property disclaimed by the decedent would have passed to the Family Residuary Trust created by Mrs. Chamberlain's will.  Section 25.2518-2(e)(2), Gift Tax Regs., provides that, if a surviving spouse disclaims, the survivor's retention of a right to beneficial enjoyment thereof will cause the survivor to be treated as directing its beneficial enjoyment unless such right is limited by an ascertainable standard. Decedent's beneficial enjoyment of the Family Residuary Trust was limited to an income interest and the Support Power; both are ascertainable standards.  See sec. 25.2518-2(e)(2), (5) <u>Example</u> (<u>6</u>), Gift Tax Regs.  Thus, decedent's beneficial interests in the Family Residuary Trust would not have invalidated an otherwise valid disclaimer under section 2518, had one been made.

C.   <u>There Is No Written Instrument Containing an</u>
     <u>Irrevocable and Unqualified Refusal of an Interest in</u>
     <u>Property</u>

"In general, a disclaimer (or renunciation) is a refusal to accept the ownership of property or rights with respect to property."  H. Rept. 94-1380, 65 (1976), 1976-3 C.B. (Vol. 3) 735, 799.  A "'qualified disclaimer' means an irrevocable and unqualified refusal to accept an interest in property that satisfies four conditions", including the condition that "the refusal must be in writing."  <u>Id.</u> at 67, 1976-3 C.B. at 801.

The person making the disclaimer must in the written disclaimer instrument affirmatively and unequivocally renounce his right to a property interest in a manner that is not subject to revocation or retraction.  The evidence in the record does not satisfy this standard.  Section 2518(b)(1) specifically requires the irrevocable and unqualified refusal to be made in a written instrument.

Neither of the Documents, nor any other writing in the record, contains any language manifesting the intent of decedent to renounce his interest in any of Mrs. Chamberlain's probate assets.  The notations and items on Exhibit 5-E only evidence decedent's efforts, after he became preoccupied with his financial security, to inventory and classify his assets after Mrs. Chamberlain's death and to determine his gross assets. While decedent may have intended to use the information in Exhibit 5-E in planning to disclaim assets, with few exceptions, as described supra, the text in Exhibit 5-E is limited to headings for columns and entries describing or identifying the assets listed, such as "T. Bill", "Portland Water" and "PG E". The many markings and notes found on the pages of Exhibit 5-E are consistent with our conclusion that decedent prepared Exhibit 5-E for his own use, namely, a determination of his gross assets, as well as the steps he should take and when he could expect to receive income at various times during the year.  What we have

not found on Exhibit 5-E is an irrevocable and unqualified refusal by decedent to accept any interest in property otherwise passing to him under the will of Mrs. Chamberlain.

Nor did the Probate Inventory that decedent filed in the local probate court in May 1993 contain an unequivocal irrevocable renunciation by decedent of any interest in any of the property listed therein.  It was as personal representative of Mrs. Chamberlain's estate, and not in a personal capacity, that decedent was required to file a probate inventory.  There was nothing unusual about the form or content of the probate court inventory that distinguished it from those that are routinely filed by personal representatives.  The Probate Inventory contained no language manifesting an intent on the part of the decedent to disclaim his interest in any property listed therein.  In sum, there is simply no evidence in the record that decedent irrevocably refused his interests in the residue of Mrs. Chamberlain's estate in a written instrument, if at all.  Decedent therefore failed to satisfy an essential requirement of section 2518(b).  Consequently, regardless of whether petitioner can meet the other requirements of section 2518(b), we hold that decedent did not make a qualified disclaimer.

D.   <u>No Written Disclaimer Designates the Property Being Disclaimed</u>

Section 25.2518-2(b)(1), Gift Tax Regs., requires that the written disclaimer identify the property being renounced and be signed by the disclaimant or his legal representative.  The purpose of this requirement, along with the requirement of section 2518(b)(2) concerning delivery of the disclaimer, discussed <u>infra</u>, is to avoid disputes about whether an interest in property was disclaimed.  See Stephens et al., Federal Estate and Gift Taxation, par. 10.07[2][a] (7th ed. 1996); 5 Bittker & Lokken, Federal Income Taxation of Income, Estates & Gifts, par. 121.7.3 at 121-52 (2d ed. 1993).

On brief, petitioner contends that assets valued at $498,889 on Mrs. Chamberlain's date of death were disclaimed. Petitioner's list of assets alleged to be disclaimed by decedent does not simply include the residue of Mrs. Chamberlain's estate--it includes all her probate assets.  Inasmuch as Mrs. Chamberlain's will provided a $75,000 pecuniary bequest to Dale, we fail to see how decedent could have disclaimed all the probate assets.

Petitioner also claims that decedent identified the assets that he was disclaiming by marking them with a "J".  Yet only $257,745 worth of assets was designated "J" by decedent on Exhibit 5-E; another $149,799 worth of assets were designated "J"

by Dale. That leaves close to $100,000 of assets that was marked "JT", that were not marked at all, or that were merely listed on the Probate Inventory. Thus, even if designating certain assets as "J" was sufficient for purposes of section 2518(b), the question of what other assets were disclaimed would still be unresolved. According to section 25.2518-2(b)(1), Gift Tax Regs.: "The writing must identify the interest in property disclaimed". We take that to mean that the writing itself, not extrinsic evidence, must specify the assets that are being disclaimed. Accordingly, inasmuch as decedent failed--within the four corners of a written disclaimer instrument--to identify any assets as being disclaimed, we hold that he did not comply with section 25.2518-2(b)(1), Gift Tax Regs.

E.   Delivery of Written Disclaimer

Section 2518(b)(2) and section 25.2518-2(b)(2), Gift Tax Regs., require delivery of the written disclaimer to the transferor of the interest, the transferor's legal representative, or the holder of legal title to the property (such as a trustee) within the applicable 9-month period. Where the disclaimant is also the legal representative of the estate, this requirement is satisfied when the disclaimant signs the written disclaimer. See Estate of Bennett v. Commissioner, 100 T.C. 42, 67 n.14 (1993) (citing Estate of Fleming v. Commissioner, 974 F.2d 894 (7th Cir. 1992), affg. T.C. Memo.

1989-675). Decedent had not yet been appointed personal representative of Mrs. Chamberlain's estate when he prepared Exhibit 5-E. Although decedent was the personal representative of Mrs. Chamberlain's estate when he signed the Probate Inventory, as discussed supra, the Probate Inventory could have no operative effect as a disclaimer by decedent in his own right, inasmuch as he signed it in a fiduciary capacity.

## II. State Law Compliance

Prior to enactment of section 2518 by the Tax Reform Act of 1976, Pub. L. 94-455, sec. 2009(b)(1), 90 Stat. 1893, the tax consequences of an effective disclaimer were prescribed under several Code sections.[6] These sections did not provide definitive rules as to what constituted a disclaimer for Federal estate, gift, or generation skipping transfer tax purposes ("Federal transfer taxes"); they relied in part on local law to determine whether a valid disclaimer had been made. See Fuller v. Commissioner, 37 T.C. 147 (1961). As a result, the Federal tax consequences of a disclaimer could depend on its treatment under local law and on the type of transfer tax being imposed. See H. Rept. 94-1380, supra at 66. Congress enacted section 2518

---

[6] See, e.g., secs. 2041(a)(2), 2514(b) (disclaimers of general powers of appointment); secs. 2055(a) and 2056(d) (estate tax charitable and marital deduction provisions); sec. 25.2511-1(c), Gift Tax Regs. (disclaimer must comply with local law in order to be valid for gift tax purposes).

with the intention of providing definitive rules for disclaimers that could be uniformly applied among the States, with all three of the Federal transfer taxes.  Id.

The enactment of section 2518 made compliance with State law alone insufficient to establish that a valid disclaimer has been made for purposes of the Federal transfer taxes.  Even if the disclaimer complies with State law, it will not be a qualified disclaimer for purposes of section 2518(a) unless it also satisfies the requirements of section 2518(b), (c)(3).  See Estate of Hennessy v. United States, 81 AFTR 2d 98-383, 98-1 USTC par. 60,298 (S.D. Ind. 1997); sec. 25.2518-2(c)(5) Example (5), Gift Tax Regs.; Bittker & Lokken, supra par. 121.7.7, at 121-63.

Nevertheless, a disclaimer will not be treated as a qualified disclaimer under section 2518 unless it is effective under applicable local law.  This is because State law determines whether or not a property interest has passed.  See Estate of Bennett v. Commissioner, supra at 67.

Under Oregon law, the common-law right to disclaim has been supplanted by the Uniform Disclaimer of Transfers by Will, Intestacy or Appointment Act.  See Or. Rev. Stat. sec. 112.650 through 112.667 (1997); Or. Rev. Stat. sec. 112.662 and Comment, Uniform Disclaimer of Transfers by Will, Intestacy or Appointment Act, sec. 5 ("Uniform Act").  Oregon Revised Statutes section 112.652 provides generally that an heir, legatee, or devisee may

disclaim the right of succession to any property by delivering to the decedent's personal representative a written instrument disclaiming the property. The written disclaimer must describe the property interest disclaimed, declare the disclaimer and the extent thereof, and be signed by the disclaimant; a copy of the disclaimer may--but need not--be filed in the court exercising probate jurisdiction. See Or. Rev. Stat. sec. 112.655.

For essentially the same reasons that decedent has failed to satisfy section 2518(b), decedent's actions also fail to satisfy Oregon Revised Statutes, section 112.652. Although no specific language is required by Oregon Revised Statutes section 112.652, the disclaimer must meet the requirements set forth in the statute and must be incorporated into a written instrument. See Palmer v. White, 784 P.2d 449, 451 (Or. Ct. App. 1989). As discussed supra, decedent did not make a refusal in writing to accept property or an interest in property, and therefore did not "declare the disclaimer and the extent thereof" in the written disclaimer instrument for purposes of Oregon law. See Or. Rev. Stat. sec. 112.652 (1997). Moreover, decedent failed to describe or designate the particular property being disclaimed, as required by section 2518(b)(1) and section 25.2518-2(b)(1), Gift Tax Regs., for Federal transfer tax purposes, and as required by Oregon Revised Statutes section 112.652.

On brief, petitioner acknowledges--and correctly so--that we are not bound by the April 8, 1994, order of distribution of Mrs. Chamberlain's estate issued by the local probate court. Legal rights and interests in property and transfers thereof are created and determined by State law, but the manner in which and the extent to which such rights and interests shall be subjected to Federal tax are determined by Federal law. See Helvering v. Stuart, 317 U.S. 154, 161 (1942); Morgan v. Commissioner, 309 U.S. 78 (1940); Estate of Sweet v. Commissioner, 234 F.2d 401 (10th Cir. 1956), affg. 24 T.C. 488 (1955); Estate of Bennett v. Commissioner, 100 T.C. at 59; see also Mapes v. United States, 15 F.3d 138 (9th Cir. 1994) (Federal law controlled whether disclaimant had an interest in his mother's estate subject to Federal tax lien, but State law controlled whether disclaimant had any interest in property, lienable or not). "An order or judgment of a State trial court obtained or entered in a nonadversarial proceeding is not binding as between one or more parties to such proceeding and the United States with respect to income or estate tax imposed by Federal legislation." Estate of Bennett v. Commissioner, supra at 60; see also Commissioner v. Estate of Bosch, 387 U.S. 456 (1967); Estate of Sweet v. Commissioner, supra at 404; Brodrick v. Moore, 226 F.2d 105 (10th Cir. 1955). Accordingly, we hold that decedent did not disclaim any property in accordance with Oregon law.

III. <u>Did Decedent Substantially Comply?</u>

    A.    <u>Substantial Compliance Doctrine</u>

Petitioner argues, despite decedent's failure to comply with the literal requirements of section 2518, that decedent nonetheless substantially complied with section 2518 because he intended to disclaim the assets at issue, accurately described the assets to be disclaimed in the Documents, and delivered the Documents to himself as personal representative. The doctrine of substantial compliance has its origins in equity and is designed to avoid hardship in cases where a party does all that can reasonably be expected of him, but he nonetheless has failed to comply with the requirements of a statutory provision. See <u>Sawyer v. County of Sonoma</u>, 719 F.2d 1001 (9th Cir. 1983).

This Court has applied the substantial compliance doctrine and excused taxpayers from strict compliance with procedural regulatory requirements, provided that the taxpayer substantially complied by fulfilling the essential statutory purpose. See, e.g., <u>American Air Filter Co. v. Commissioner</u>, 81 T.C. 709, 720 (1983); <u>Tipps v. Commissioner</u>, 74 T.C. 458, 468 (1980); <u>Taylor v. Commissioner</u>, 67 T.C. 1071 (1977); <u>Hewlett-Packard Co. v. Commissioner</u>, 67 T.C. 736, 748 (1977); <u>Sperapani v. Commissioner</u>, 42 T.C. 308, 330-333 (1964). Most cases in which we have applied the doctrine of substantial compliance were alleged failures to

make an election in accordance with applicable regulations.[7]
"The making of an election is involved where a taxpayer has a
choice of two methods of computing his tax, each of which is
legal."  Thorrez v. Commissioner, 31 T.C. 655, 668 (1958), affd.
per curiam 272 F.2d 945 (6th Cir. 1959).  The effect of an
election is generally limited to tax consequences.  In contrast,
a disclaimer has both tax and nontax consequences, insofar as its
validity under section 2518 depends on the passage of property
under State law.  See Estate of Bennett v. Commissioner, supra.
Moreover, if a decedent makes a valid disclaimer, there is no
elective tax treatment; under section 2518, the property will
perforce be treated as if it had never passed or been transferred
to the decedent.

Federal tax questions of substantial compliance have arisen
only on rare occasion outside the election context.  Compare

---

[7] See, e.g., Prussner v. United States, 896 F.2d 218 (7th
Cir. 1990); Fischer Indus., Inc. v. Commissioner, 843 F.2d 224
(6th Cir. 1988); Kerry v. Commissioner, 89 T.C. 327 (1987); Young
v. Commissioner, 783 F.2d 1201 (5th Cir. 1986), affg. 83 T.C. 831
(1984); American Air Filter Co. v. Commissioner, 81 T.C. 709
(1983); Tipps v. Commissioner, 74 T.C. 458 (1980); Penn-Dixie
Steel Corp. v. Commissioner, 69 T.C. 837 (1978); Taylor v.
Commissioner, 67 T.C. 1071 (1977); Hewlett Packard Co. v.
Commissioner, 67 T.C. 736 (1977); Columbia Iron & Metal Co. v.
Commissioner, 61 T.C. 5 (1973); Valdes v. Commissioner, 60 T.C.
910 (1973); Hoffman v. Commissioner, 47 T.C. 218 (1966), affd.
per curiam 391 F.2d 930 (5th Cir. 1968); Sperapani v.
Commissioner, 42 T.C. 308 (1964); Cary v. Commissioner, 41 T.C.
214 (1963); Thurman v. Commissioner, T.C. Memo. 1998-233);
Rockwell Inn, Ltd. v. Commissioner, T.C. Memo. 1993-158.

Hewitt v. Commissioner, 109 T.C. 258 (1997) (no substantial compliance found where petitioners failed to obtain an appraisal required by section 1.170A-13, Income Tax Regs. of nonpublicly traded stock that they donated), affd. per curiam 166 F.3d 332 (4th Cir. 1998), with Bond v. Commissioner, 100 T.C. 32 (1993) (substantial compliance with that regulation found where petitioners obtained a qualified appraisal, but did not attach a written report to their return).  See also Estate of Bennett v. Commissioner, supra at 72-74 (discussing In re Will of Witz, 406 N.Y.S.2d 671 (Sur. Ct. 1978) (attempted disclaimer treated as in substantial compliance with State statute)).

In other cases in which a substantial compliance claim has been raised, we have consistently required "specific, contemporaneous, and incontrovertible evidence of a binding election to accept the tax consequences imposed by the section. We are not at liberty to infer that an election existed when the unequivocal proof required by Congress does not exist."  Tipps v. Commissioner, supra at 470-471; Dunavant v. Commissioner, 63 T.C. 316 (1974); see also Young v. Commissioner, 83 T.C. 831, 839 (1984) ("the taxpayer must exhibit in some manner, within the time prescribed by the statute, his unequivocal agreement to accept both the benefits and burdens of the tax treatment afforded by that section."), affd. 783 F.2d 1201 (5th Cir. 1986); Valdes v. Commissioner, 60 T.C. 910, 914-915 (1973).  Thus, a

prerequisite to seeking relief under the substantial compliance doctrine is a showing that the taxpayer wished to avail himself of a certain tax treatment and attempted to comply with the applicable requirements. Finally, there is no defense of substantial compliance for failure to comply with the essential requirements of the governing statute. See Prussner v. United States, 896 F.2d 218, 224 (7th Cir. 1990); see also Tipps v. Commissioner, supra at 468; Penn-Dixie Steel Corp. v. Commissioner, 69 T.C. 837, 846 (1978); Rockwell Inn, Ltd. v. Commissioner, T.C. Memo. 1993-158. Moreover, substantial compliance cannot be applied if to do so would defeat the policies of the underlying statutory provisions. See Sawyer v. County of Sonoma, supra at 1008.

We have examined the specific requirements of section 2518(b) to determine whether they relate to the substance or essence of the statutory and regulatory scheme. See Young v. Commissioner, supra at 838; Tipps v. Commissioner, supra. We have also examined the legislative history of section 2518. See, e.g., Cary v. Commissioner, 41 T.C. 214, 218-219 (1963); Taylor v. Commissioner, supra at 1078; see also United States v. St. Regis Paper Co., 355 F.2d 688, 692 (2d Cir. 1966) ("If a requirement [of a statute] is so essential a part of the plan that the legislative intent would be frustrated by a

noncompliance, then it is mandatory."); <u>Vaughn v. John C. Winston Co.</u>, 83 F.2d 370, 372 (10th Cir. 1936).

Congress enacted section 2518 in order to provide definitive and uniform disclaimer rules for purposes of the Federal transfer taxes. From the legislative history and text of section 2518, it is clear that, above all else, a valid disclaimer requires an irrevocable and unqualified refusal, expressed in writing, to accept an interest in property. The policy underlying the requirements of section 2518(b) is to ensure that only actual and verifiable refusals of an interest in property, made without the benefit of hindsight, are treated as disclaimers for purposes of the Federal transfer taxes. See <u>Estate of Lute v. United States</u>, 19 F. Supp. 2d 1047 (D. Neb. 1998) (citing 5 Bittker & Lokken, <u>supra</u>, par. 121.7.2 at 121-51). Essential to the furtherance of this policy is the requirement that an irrevocable and unqualified refusal be made timely in a written instrument. Unless the intent to disclaim is expressed in writing, the disclaimant retains a degree of control over the property after the purported disclaimer because he can freely withdraw the disclaimer after the fact. Because the disclaimant is able to withdraw an equivocal disclaimer after the fact, when the purported disclaimer is claimed to have occurred, it is impossible to determine whether the property will ultimately vest in the taxpayer or some other person. See <u>Estate of Lute v.</u>

<u>United States</u>, <u>supra</u>; Bittker & Lokken, <u>supra</u>.  With hindsight, the disclaimant could later decide whether or not to treat the equivocal instrument as a disclaimer or keep the property.

We had similar concerns in <u>Valdes v. Commissioner</u>, 60 T.C. 910, 915 (1973), where we rejected a claim of substantial compliance:

> That Congress fixed a deadline of December 31, 1965, for making the election suggests that a taxpayer was not to be allowed to file an ambiguous statement which would permit him to wait and see whether the benefits would outweigh the burdens of the election in his individual case.  Rather, as a minimum, the taxpayer is required to definitely commit himself as to whether he elects to have section 172(b)(1)(D) apply * * *.  * * *

B.    <u>No Persuasive Evidence of Disclaimer</u>

From the inception of this case, petitioner's counsel has characterized respondent's determination not to recognize decedent's alleged disclaimer as a reliance on technicalities. According to petitioner, "the government's approach to these cases * * * is always an approach which wants to find some minute defect in what the taxpayer did and then deny congressionally granted tax benefits based on that minute defect."  In the absence of a written disclaimer, petitioner has relied on the testimony of Dale, with that of Messrs. Meyer and Kadish, the attorneys who handled the estates of the Chamberlains (collectively, "witnesses"), to establish that decedent substantially complied with section 2518.

## 1. Petitioner's Intent to Disclaim

According to petitioner, "everyone agrees that Mr. Chamberlain [decedent] intended to disclaim."  Petitioner apparently believes that the mere showing of intent, without any actions on the part of the decedent in furtherance of his intent, is sufficient for a showing of substantial compliance.  We disagree.  See Tipps v. Commissioner, 74 T.C. 458 (1980); Dunavant v. Commissioner , supra; Taylor v. Commissioner, 67 T.C. 1071 (1977); Valdes v. Commissioner, supra.  Even if decedent told Dale and Mr. Meyer that he intended or wished to or did disclaim the assets marked J, or the assets solely owned by Mrs. Chamberlain at her date of death, an oral statement to any of those effects would not and does not satisfy the requirement that the refusal be in writing.  See sec. 2518(b).

At trial, Dale testified that decedent had discussed disclaiming the probate assets with him for a long time and that decedent planned to disclaim "the amount that would absolutely minimize taxes down to the last dollar."  No part of Dale's testimony, however, concerned his actual knowledge of a disclaimer.  Dale never witnessed the decedent take any actions to disclaim, and there is no indication that decedent ever told Dale that he had done something that he intended to be legally operative as a disclaimer.  Dale could not remember asking decedent whether he was going to have a specific disclaimer

document prepared and did not remember decedent's saying that he was going to have a written disclaimer prepared for him. Finally, when asked by the Court whether he had discussed the alleged disclaimer with Meyer & Wyse, Dale equivocated and backtracked in his testimony, first saying that he did not have a conversation about the disclaimer until after September 7, 1993 (the due date for filing the estate tax return for Mrs. Chamberlain); in further questioning, Dale admitted that he could not recall being aware of the alleged disclaimer at the time he signed the Form 706 estate return for decedent's estate, which had been prepared by Mr. Kadish, and could not recall whether he first became aware of the alleged disclaimer in connection with the audit of petitioner's Form 706, or at some earlier date.

The testimony offered by Messrs. Kadish and Meyer regarding decedent's intent is also unpersuasive. Mr. Meyer testified that decedent told him he was disclaiming the J assets when they met in December 1992. Mr. Kadish testified that he and Mr. Meyer considered this in taking the position that decedent had disclaimed:

> based upon his rather detailed outline of June's separate assets, which he signed, and also the probate inventory, which he signed, and coupled with his intention, which was repeatedly, I believe, expressed to Mr. Meyer that he wished to disclaim all these assets, we took the position that that constituted in effect a disclaimer.

Mr. Kadish admitted in testimony that he had never discussed the topic of disclaimer with decedent, but that instead he had relied on what Mr. Meyer told him about decedent's intentions. If Messrs. Meyer and Kadish were confident that decedent's expression of intent to disclaim in December 1992 constituted a disclaimer, then why did they prepare Exhibit 8-H, a draft of a written disclaimer, in March 1993? If Exhibit 8-H were superfluous, why would Mr. Meyer admit in testimony that his firm had been negligent in failing to see to it that decedent executed Exhibit 8-H? If petitioner's position carried any weight, which it does not, a great portion of it would fall on petitioner's contention that Exhibit 5-E satisfied the written disclaimer requirement of section 2518(b). According to petitioner, the purpose of Exhibit 5-E was:

> To identify which assets were Mom's [Mrs. Chamberlain's] property, which were his [decedent's] property, and which were joint property to effect the plan to settle the estate, the estate plan.

> \* \* \* \* \* \* \*

> He had for a long time [discussed disclaiming J assets], and while we were going over this document, he was talking about these would be the assets he would disclaim.

Petitioner's testimony was in the subjunctive future tense and does not say that Exhibit 5-E was a disclaimer or even intended to be one. If decedent had intended Exhibit 5-E to be a disclaimer, we believe that he would have considered it important

enough to show it to Mr. Meyer, decedent's longtime acquaintance and a trusted adviser. Mr. Meyer was in frequent contact with decedent after Mrs. Chamberlain's death; yet, at trial, Mr. Meyer had no specific recollection of speaking with decedent about Exhibit 5-E. If decedent intended to disclaim using Exhibit 5-E, why did he total the values of the assets listed on Exhibit 5-E to determine his gross assets but not reduce those totals by the values of the assets that he intended to disclaim? We think that decedent intended Exhibit 5-E to serve: (1) As the "list of all assets * * * & how they are held", that Mr. Kadish referred to in his response to Mr. Meyer on Exhibit 4-D that they needed to prepare Form 706 for Mrs. Chamberlain's estate and to plan decedent's disclaimer, and (2) as a worksheet that enabled decedent to track his gross assets and determine when he would be receiving interest and dividend payments. This explains why decedent began preparing Exhibit 5-E after meeting with Mr. Meyer and organized the listing of assets according to the dates that interest and dividend payments would be made, rather than grouping the assets according to their source; i.e., "J", "JT", "T". Our conclusion is also supported by testimony about decedent's personality, by Mr. Meyer, who had known decedent for many years, as well as by Dale:

> [Decedent] was very methodical. He was an engineer.
> He took very careful care of his finances. He took
> pride in his ability to maintain control over his life

and his assets, and so he would keep careful records of them, and I was familiar with those records and would see them.

According to Dale, after Mrs. Chamberlain's death, decedent became increasingly cautious in the management of his finances:

He got to the point where he would check with me before he did anything, and he did very little. He owned stock. He kept stock. He owned bonds. He held them. * * *

* * * * * * *

He continually became more and more cautious. He wouldn't do anything without checking with me. He made very few investment changes.

### 2. What Assets Were Disclaimed?

Even assuming for the sake of argument that decedent had disclaimed something, the question of what assets had been disclaimed would still be unresolved. Rather than resolving this question, the inconsistencies in the testimony of the witnesses further convince us that decedent did not disclaim. Each of the witnesses has testified that decedent intended to disclaim all the probate assets; yet there is just as much evidence that decedent had actually intended, in order to maximize the use of the unified credit, to disclaim much more than just the probate assets. According to Dale, decedent "had planned to disclaim the amount that would absolutely minimize taxes down to the last dollar." A basic step in any effort to minimize estate taxes is the use of the unified credits of each spouse, which allow

property to pass to heirs without inclusion in the taxable estate. See sec. 2010; Manning et al., supra at 1-22. If decedent sought to minimize his estate taxes "down to the last dollar", he would have wanted to disclaim enough property to use fully the unified credit in Mrs. Chamberlain's estate. In contradiction to his own testimony, Dale testified that while he and decedent were reviewing Exhibit 5-E, "he [decedent] was talking about these [the probate assets] would be the assets he would disclaim." The probate assets, including the $75,000 that would be used to pay Dale's specific bequest, had a date of death value of $492,761 yet the unified credit available for Mrs. Chamberlain's estate was $600,000. Thus, unless decedent also disclaimed a portion of his survivorship interests in joint tenancy property, $107,239 of the unified credit would be wasted.

At trial, Mr. Meyer testified that decedent had expressed his intent to disclaim the probate assets. This statement, however, contradicts Exhibits 4-D and 9-I, memoranda written by Mr. Meyer and Mr. Kadish's responses thereto, and Exhibit 8-H, the disclaimer document that was prepared by Mr. Kadish. All 3 exhibits clearly contemplate a disclaimer of joint tenancy property to the extent necessary to use the full amount of the unified credit, after taking into account the probate assets. In Exhibit 4-D, Mr. Kadish's response to Mr. Meyer illustrates that they were of the view that joint tenancy property could be

disclaimed,[8] and were indeed considering it.  Thus, when drafting

Exhibit 8-H, Mr. Kadish used $525,000 as the amount that would be

disclaimed, which exceeded the value of the probate assets after

deducting the $75,000 needed to pay the specific bequest.  Mr.

Kadish did not identify the specific assets to be disclaimed when

he drafted Exhibit 8-H because he and Mr. Meyer planned to

determine which assets would be disclaimed after all the probate

and joint tenancy assets were identified and valued.  As

described in Exhibit 9-I, Mr. Meyer planned to value Mr.

Chamberlain's survivorship interests in jointly held bonds and

then disclaim however many bonds would be necessary to use fully

the unified credit:

> I will need to make up a total list of joint bonds
> as well, but we won't pick those up right now, but
> we're going to have to make a quick decision.  Let's
> get what were [sic] talking about, we'll value them
> and then see how many more we want to add to the
> pile.

Decedent never signed Exhibit 8-H--not because a disclaimer

was otherwise accomplished--but because, as petitioner's counsel

---

[8] Former disclaimer regulations in effect prior to
decedent's death required a survivorship interest in a joint
tenancy to be disclaimed within 9 months of the creation of the
tenancy.  However, by the time of Mrs. Chamberlain's death, it
was generally accepted, in the case of a unilaterally severable
interest in a joint tenancy, that the date of death of the joint
tenant was the starting point for measuring the timeliness of a
disclaimer under sec. 2518(b)(2).  See McDonald v. Commissioner,
T.C. Memo. 1989-140, on remand from 853 F.2d 1494 (8th Cir.
1988); IRS Action on Decision 1990-06 (Feb. 7, 1990).

acknowledged at trial--of the "inadvertence and oversight and negligence at [Myer & Wyse]...this [signing Exhibit 8-H] was not carried through."

C.    No Compliance

Petitioner's counsel has tried to cure the effects of the inadvertence by cobbling together a series of nondispositive documents and events.

These efforts are unavailing because substantial compliance cannot be predicated on lack of compliance.  Contrary to petitioner's characterizations of the situation, we do not find respondent's refusal to recognize the alleged disclaimer to be "a rigid, inequitable application of the regulations."  In the case at hand, decedent failed to make an irrevocable and unqualified refusal in writing of an interest in property.  This was hardly a failure to comply with procedural or directory requirements. Decedent failed to execute a written document containing a manifestation of his intent to disclaim the assets marked "J", or any other interests in property, and he therefore failed to comply with the essential requirements of section 2518.  See American Air Filter Co. v. Commissioner, 81 T.C. at 719.  "[T]his is not a case where the taxpayer has fulfilled all underlying requirements but failed to file evidence of such facts."  Penn-Dixie Steel Corp. v. Commissioner, 69 T.C. at 847; Columbia Iron & Metal Co. v. Commissioner, 61 T.C. 5 (1973).  "Nor is it a case

where the taxpayer's failure is only an oversight or mistake which was corrected immediately after discovery." <u>Penn-Dixie Steel Corp. v. Commissioner</u>, <u>supra</u> at 847; see <u>Haft Trust v. Commissioner</u>, 61 T.C. 398 (1973), supplemented by 62 T.C. 145 (1974) and vacated and remanded 510 F.2d 43 (1st Cir. 1975); <u>Cary v. Commissioner</u>, 41 T.C. 214 (1963); <u>Reaver v. Commissioner</u>, 42 T.C. 72 (1964); see also Judge Posner's comments in <u>Prussner v. United States</u>, 896 F.2d at 224:

> The common law doctrine of substantial compliance should not be allowed to spread beyond cases in which the taxpayer had a good excuse (though not a legal justification) for failing to comply with either an unimportant requirement or one unclearly or confusingly stated in the regulations or the statute. * * *

Petitioner's evidence, explanations, and argument do not provide any valid substitute for decedent's failure to comply with section 2518. What petitioner is seeking is "not the application of the substantial compliance principle but an exemption from the clear requirement of the statute and regulations". <u>Hewitt v. Commissioner</u>, 109 T.C. at 265-266. Decedent did not substantially comply with the requirements of section 2518 and did not disclaim any property for purposes of the Federal estate tax or of Oregon law.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.